IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN RE: SHALE OIL ANTITRUST LITIGATION Case No. 1:24-md-03119-MLG-LF

This Order Relates to All Cases

**MEMORANDUM OPINION AND ORDER GRANTING IN PART DEFENDANTS' JOINT MOTION TO DISMISS, GRANTING IN PART DEFENDANTS' INDIVIDUAL MOTIONS TO DISMISS, AND ORDERING JURISDICTIONAL DISCOVERY**[1]

Plaintiffs accuse some of the nation's largest shale oil producers of conspiring to restrain production to increase the prices of crude oil and its derivative products. Defendants seek dismissal on numerous and varied grounds. They challenge the justiciability of the case, the sufficiency of the alleged conspiracy, antitrust standing, and the viability of dozens of claims arising under state law. Most of those challenges are premature or unpersuasive at the pleading stage, although some claims fail as a matter of law and certain jurisdictional questions require further factual development. The case therefore proceeds, but not in its entirety and not without some prefatory questions requiring resolution. The Court's ruling and reasoning are set forth below.

## BACKGROUND

In early 2025, several individuals, businesses, and political subdivisions (collectively "Plaintiffs") filed a Consolidated Class Action Complaint ("CCAC") alleging that eight domestic shale oil producers and two of their CEOs[2] (collectively "Defendants") conspired to constrain

[1] This Memorandum Opinion and Order also denies Permian's Motion for Judicial Notice. Doc. 128.

[2] The eight oil producers include Permian Resources Corporation, known as Centennial Resource Development, Inc. during the relevant period; Chesapeake Energy Corporation, now known as Expand Energy Corporation; Continental Resources, Inc.; Diamondback Energy, Inc.; EOG

domestic shale oil production which, in turn, artificially inflated its price and that of its derivative products throughout the United States.[3] Doc. 86 ¶¶ 1, 8, 237. Based on these assertions, Plaintiffs seek to certify a nationwide injunctive class[4] of end-payors pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1. Doc. 86 ¶¶ 260-65. They also request damages (on a class-wide basis) in accordance with applicable state statutes.[5] *Id.* ¶¶ 266-73. In total, Plaintiffs bring fifty-four claims for relief. *Id.* ¶¶ 260-385.

Defendants filed a Joint Motion to Dismiss ("Joint MTD"), arguing that Plaintiffs' claims fail "for multiple independent reasons." Doc. 129 at 13. Specifically, Defendants contend that (1) this Court lacks subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and the political question and act of state doctrines; (2) Plaintiffs fail to plead a plausible antitrust

---

Resources, Inc.; Hess Corporation; Occidental Petroleum Corporation; and Pioneer Natural Resources Co. Doc. 86 ¶¶ 70-77. One of the individual defendants includes Scott D. Sheffield, who served as "the [CEO] of Defendant Pioneer at all times relevant to [the CCAC], until his retirement at the end of 2023." *Id.* ¶ 78. The other is John B. Hess, who "has been the [CEO] of Hess since 1995 and has served as CEO during all times relevant to [the CCAC]." *Id.* ¶ 79.

[3] These oil-derivative products include but are not limited to gasoline; distillate fuel, such as diesel fuel and home heating oil; marine fuel; and jet and aviation fuel. Doc. 86 ¶ 6.

[4] Plaintiffs define the Nationwide Injunctive Relief Class as "[a]ll persons, governmental and non-governmental entity end purchasers of crude oil derivative fuel products in the United States from January 1, 2021 and until present . . . ." Doc. 86 ¶ 248.

[5] The CCAC defines the State Law Class as:

> All persons, governmental and non-governmental entity end purchasers of crude oil derivative fuel products in Arkansas, Alabama, Arizona, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine Maryland, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and/or Wisconsin from January 1, 2021 and present.

Doc. 86 ¶ 249.

conspiracy claim; (3) Plaintiffs lack antitrust standing; (4) Plaintiffs' various state antitrust and consumer protection law claims are premised upon the same conduct as their under-supported Sherman Act claim and must therefore be dismissed; and (5) the state law claims also suffer from numerous deficiencies. Doc. 129 at 14-15.

The Court grants Defendants' Joint MTD in part. Specifically, the Court:

1. Dismisses Counts 21 and 43 in their entirety,[6] *infra* Section IV.I.;
2. Dismisses Counts 8 and 36 in part by barring recovery under the relevant statutes for conduct occurring before June 7, 2023, and August 5, 2022, respectively,[7] *infra* Section IV.C.;
3. Dismisses Count 22 in part by disallowing Waypoint Residential LLC's claims under the relevant statute,[8] *infra* Section IV.H.;
4. Dismisses Count 28 in part by prohibiting Best Expedite Inc. from pursuing claims under the relevant statute,[9] *infra* Section IV.F.;
5. Dismisses Count 29 in part by barring plaintiffs who purchased derivative products for business purposes—namely, Samantha Barsky d/b/a Noteify, Best Expedite

[6] These claims are brought under the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13-101 to -501, and the Oregon Unfair Trade Practices Act, Or. Rev. Stat. Ann. §§ 646.605 to 646.700, respectively. Doc. 86 ¶¶ 313, 359.

[7] Plaintiffs bring Count 8 under the Colorado State Antitrust Act of 2023, Colo. Rev. Stat. §§ 6-4-101 to -122, and Count 36 pursuant to the New Jersey Antitrust Act, N.J. Stat. §§ 56:9-3 to -19. *See* Doc. 86 ¶¶ 288, 346.

[8] Plaintiffs seek relief here under the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ann., Ch. 93A §§ 1 -11. Doc. 86 ¶ 316.

[9] Best Expedite Inc.'s claim is brought pursuant to the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.005 to 407.3600. Doc. 86 ¶ 328-29.

Inc., Waypoint Residential LLC, and Garvin Promotion Group LLC—from bringing claims under the relevant statute,[10] *infra* Section IV.F.;

6. Dismisses Count 3 entirely,[11] *infra* Section IV.D.; and

7. Dismisses Counts 2 and 44 in their entirety,[12] *infra* Section IV.L.

Additionally, Continental, Diamondback, EOG, Permian, Occidental, Expand, Hess Defendants,[13] and Pioneer filed individual motions to dismiss. Docs. 123-27, 130-32. Permian also requested judicial notice of materials submitted in support of its motion to dismiss. Doc. 128. With respect to those, the Court orders the following:

1. Continental's, Diamondback's, EOG's, Permian's, and Occidental's motions to dismiss are denied. Docs. 123-27; *infra* Section V.

2. Expand's motion to dismiss is granted in part, as Count 1 is dismissed against it. In all other respects, Expand's motion is denied. Doc. 131; *infra* Section V.

3. Hess Defendants' 12(b)(6) portions of their motion are denied, and their 12(b)(2) argument is held in abeyance pending limited jurisdictional discovery. Doc. 132; *infra* Section V.

4. Pioneer's 12(b)(2) motion is also held in abeyance while the relevant parties conduct limited jurisdictional discovery. Doc. 130; *infra* Section V.

---

[10] This claim is brought pursuant to the Montana Unfair Trade Practices and Consumer Protection Act of 1973, Mont. Code Ann. §§ 30-14-101 to -166. Doc. 86 ¶ 331.

[11] Plaintiffs bring Count 3 under Alabama Code § 6-5-60. Doc. 86 ¶ 276.

[12] Count 2 is pursued under Arkansas's Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-101 to -1705, and Count 44 is brought pursuant to Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1 to -10. *See* Doc. 86 ¶¶ 274, 263.

[13] The Court refers to Hess Corporation as "Hess," uses "John B. Hess" to refer to the individual, and collectively terms them "Hess Defendants."

5. The parties must provide their proposal for resolving Pioneer's, Hess's, and John B. Hess's 12(b)(2) motions no later than 5:00 PM (MDT) on September 16, 2026.

6. Permian's motion for judicial notice is denied. Doc. 128; *infra* Section V.

**PLAINTIFFS' FACTUAL CONTENTIONS[14]**

Defendants engage in the "exploration, development, and production of domestic" shale oil. Doc. 86 ¶¶ 7-8. Shale oil "is a high-quality crude oil found between layers of shale rock, impermeable mudstone, or siltstone that can be extracted, refined, and used to produce gasoline, diesel fuel, home heating oil, and other commercial products sold in the U.S." *Id.* ¶ 2. Producers extract shale oil by fracturing the oil-containing rock formations, a process referred to as hydraulic fracturing or "fracking." *Id.* ¶ 3.

In the early 2000s, domestic shale oil production increased sufficiently to reverse a thirty-five-year decline in U.S. oil output. *Id.* ¶ 97. According to Plaintiffs, between 2008 and 2015, shale producers drove what has been termed "the Shale Revolution," a period marked by the fastest increase in domestic oil production in U.S. history. *Id.* During that time, Defendants became capable of responding rapidly to changing market conditions and, in turn, materially influencing crude oil prices, thereby functioning as "swing producers." *Id.* ¶ 8.

The growing market power of shale oil producers disrupted global oil pricing and weakened the Organization of the Petroleum Exporting Countries' ("OPEC")[15] historical control

[14] The Court draws these facts from the CCAC, takes them as true, and makes all reasonable inferences in Plaintiffs' favor for purposes of the Joint MTD and Defendants' individual motions to dismiss. Doc. 86; *see, e.g.*, *Clinton v. Sec. Ben. Life Ins. Co.*, 63 F.4th 1264, 1279 n.16 (10th Cir. 2023) ("[T]he 'bedrock principle' at this stage is 'that a judge ruling on a motion to dismiss must accept all allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.'" (quoting *Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008))). These contentions are adopted only insofar as necessary to address the instant matter.

[15] OPEC is "an intergovernmental organization made up of nations who purport to benefit from sovereign immunity to the Sherman Act"; it "controls close to 40% of the world's oil production";

over the world's oil supply. *Id.* ¶ 96. OPEC responded to Defendants' production with their own production increases sufficient to cause a reduction in prices. *Id.* ¶¶ 105-07. Despite OPEC's actions, U.S. shale producers continued to expand production by implementing technological advancements and increasing operational efficiency. The result was lower breakeven costs and profitable extraction from less productive shale formations. *Id.* ¶ 106. Defendants thus continued fracking operations throughout the relevant period. *Id.* ¶ 107.

After its efforts to stymie Defendants' fracking operations through price competition allegedly failed, OPEC began a 'years-long campaign to add them to the cartel. *Id*. ¶ 110. And OPEC members began meeting with Defendants thereafter. *Id.* ¶¶ 112, 115. Plaintiffs identify the CERAWeek Conference—an annual event in Houston, Texas—as one of the principal forums allowing for direct communications between Defendants and OPEC officials. *Id.* ¶¶ 113-25, 132-35. The CCAC includes illustrative examples. At the March 2017 CERAWeek event, OPEC and Defendants expressed a shared interest in reducing supply and stabilizing oil markets, but U.S. shale producers were not yet prepared to abandon anticipated production growth. *Id.* ¶ 115. During the next year's CERAWeek, executives from several Defendant companies met with OPEC officials at a restaurant in Houston. *Id.* ¶ 120. At that meeting, Centennial's CEO Mark Papa stated "that everyone will work together to make sure the oil market is well-supplied and everyone is happy to be working together." *Id.* (citation modified). Similarly, during CERAWeek 2019, John B. Hess, Occidental's Vicki Hollub, Centennial's Papa, and Diamondback's Travis Stice had dinner with OPEC personnel. *Id.* ¶ 134. Stice described the meeting as "a very good session"

---

and it "[h]istorically exerted market power over global oil prices through coordinating its members' respective production levels." Doc. 86 ¶ 93.

featuring "open dialogue" regarding U.S. shale oil production and larger industry concerns.[16] *Id.*

Other meetings occurred outside of CERAWeek. For example, Defendants met with OPEC at the 2018 OPEC Summit in Vienna and the 2019 World Economic Forum in Switzerland, where they discussed future oil production levels. *See id.* ¶¶ 126-31. These gatherings coincided with various signals from Defendants that Plaintiffs contend manifested an intent to constrain production. As an example, in late 2020, Defendant EOG Resources's CEO Bill Thomas publicly stated, "In the future, certainly we believe OPEC will be the swing producer – really, totally in control of oil prices. We don't want to put OPEC in a situation where they feel threatened, like we're taking market share while they're propping up oil prices." *Id.* ¶ 140 (citation modified).

The COVID-19 pandemic factors into Plaintiffs' narrative. Various constraints on activities implemented in response to the pandemic caused the price of crude oil and its derivative products to decline precipitously, contributing to consolidation within the domestic shale oil industry and forcing smaller producers into bankruptcy. *Id.* ¶ 138. But following the easing of pandemic-related restrictions, demand for gasoline and other petroleum-based products surged, and by March 2021, crude oil approached $70 per barrel. *Id.* ¶ 142. Despite these price increases, Plaintiffs allege, Defendants constrained production and simultaneously emphasized supply discipline. *Id.* ¶ 143 (showing specific Defendants touting discipline or a similar attribute, including Individual Defendant Sheffield, then-CEO of Pioneer, Chesapeake's CEO Doug Lawler, Occidental's CEO Vicki Hollub, and EOG's President and CEO Bill Thomas). Journalists and other oil industry observers were reportedly puzzled by Defendants' conduct. *See id.* ¶ 144

---

[16] Defendants also met with each other and "OPEC officials during the 2022 CERAWeek Conference . . . ." *Id.* ¶ 152. "In Houston, Defendants and OPEC gathered in a private room at a restaurant and U.S. producers presented OPEC Secretary General Barkindo with a bottle labeled Genuine Barnett Shale – from the oilfield that launched the shale revolution." *Id.* (citation modified).

(discussing how Reuters reporters and Bank of America's Managing Director and Head of U.S. Oil and Gas expressed surprise and confusion toward Defendants' restraint given their breakeven prices were lower than Saudi Arabia's and Brent was high). By the middle of 2022, crude oil prices exceeded $120 per barrel. *Id.* ¶¶ 146-47. At the same time, shale producers' breakeven prices hovered around $30 per barrel. *Id.* ¶ 150. Even so, Defendants allegedly declined to correspondingly expand production. *See id.* ¶ 149 (identifying statements from certain Defendants that Plaintiffs characterize as economically irrational given favorable market conditions for expanding production including some from Sheffield, Continental's CEO Berry, Diamondback's CEO Travis Stice, EOG Resources Inc., and Vicki Hollub).

In short, Plaintiffs' theory is that Defendants agreed to constrain domestic shale oil production to artificially increase the price of crude oil and its derivative products throughout the United States. Plaintiffs allege that those price effects reached end purchasers, including Plaintiffs, who paid supracompetitive prices for gasoline and other petroleum products. *Id.* ¶¶ 13-15, 263.

**RELEVANT LEGAL STANDARDS**

In resolving a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), the Court determines whether a complaint contains sufficient factual allegations that, when taken as true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This is not a demanding standard, and a plaintiff need not establish a prima facie case at the pleading stage. *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012) (explaining a plaintiff is "not required to set forth a prima facie case for each element, she is [only] required to set forth plausible claims"); *Brown v. City of Tulsa*, 124 F.4th 1251, 1264 (10th Cir. 2025) ("We impose a 'low bar for surviving a motion to dismiss . . . .'" (quoting *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020))). Plausibility is the touchstone inquiry. The "complaint must contain sufficient factual matter . . . to 'state a claim to relief that is

plausible on its face,'" and a "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable[] and 'that a recovery is very remote and unlikely.'" *See Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). In making the decision, courts should be mindful that "[a] motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004) (quoting *Lone Star Indus. Inc. v. Horman Family Trust*, 960 F.2d 917, 920 (10th Cir. 1992)).

Federal Rule of Civil Procedure 12(b)(1) authorizes a district court to dismiss claims for lack of subject matter jurisdiction. Rule 12(b)(1) motions "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based." *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002). Here, the Joint MTD raises a facial attack on the allegations contained in the CCAC. *See* Doc. 129 at 13-14, 27, 29-30. The Court thus applies the Rule 12(b)(6) standard and accepts as true the allegations in the CCAC. *Ruiz*, 299 F.3d at 1180; *see also United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001).

## DISCUSSION[17]

### I. Political Question and Act of State

Parts of the CCAC tie OPEC to Plaintiffs' claims that Defendants constrained production to fix global prices. For example, Plaintiffs allege that "Defendants and OPEC signaled to each other their willingness to end their price war and market share competition once and for all and conspire on their respective production levels and, consequently, global crude oil prices." Doc. 86 ¶¶ 85, 136, 139. Other allegations focus on a claimed domestic conspiracy. A few of these include: "This action arises from Defendants' conspiracy to coordinate, and ultimately constrain, domestic

[17] The Court discusses the Joint MTD's issues in the order in which they are presented. For the Individual Motions to Dismiss, the Court analyzes by common topic. *See infra* Section V.

shale oil production"; "Defendants' cartel is a per se unlawful restraint of trade under numerous state antitrust and competition laws"; and Defendants used terms such as "being 'disciplined,' or focusing on 'value growth,' or 'staying in line'" as "code words" reflecting "Defendants' agreement to coordinate and restrain domestic shale oil production." *Id.* ¶¶ 1, 16, 162; *see also id.* ¶¶ 70-77 (describing how each Defendant "sold shale oil into the U.S. domestic market where it [was] refined and disseminated to end users across the country").

Reading the CCAC as a whole, the Court finds (at this stage of the proceedings) that Plaintiffs' central theory is that Defendants—none of whom are OPEC members or foreign sovereigns—formed a domestic cartel to constrain production to fix prices in the United States. The Court further holds that Plaintiffs have plausibly alleged that Defendants reduced domestic production pursuant to that agreement and that a conspiracy may be inferred from market conditions and Defendants' production decisions, communications, and public statements.[18] *Id.* ¶¶ 1, 15-16, 160-61.

For the reasons explained below, the Court holds that neither the political question nor the act of state doctrines requires dismissal of this matter.

**A. Political Question**

The political question doctrine is a narrow exception to the general rule that a federal court should decide cases properly pending before it. *See, e.g.*, *Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012) ("In general, the Judiciary has a responsibility to decide cases properly before it,

---

[18] Additionally, Plaintiffs allege that "Defendants' agreement is complemented by their cooperation and collusion with [OPEC], the international cartel of large oil producing nations, that also sought to raise oil prices by limiting oil production during this period." Doc. 86 ¶ 10. As alleged there, Defendants' dealings with OPEC are complementary (not central) to their conspiracy, and OPEC is its own international cartel with its own aims.

even those it would gladly avoid." (citation modified)). It applies in those limited circumstances where there is:

> [(1)] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [(2)] a lack of judicially discoverable and manageable standards for resolving it; or [(3)] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [(4)] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [(5)] an unusual need for unquestioning adherence to a political decision already made; or [(6)] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962). In applying the doctrine, "the court must analyze the claim as it would be tried." Doc. 191 at 12 (citation modified) (quoting *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 951 (5th Cir. 2011)).

Here, Defendants argue that this case cannot be tried because trial would require the Court to determine whether they "'entered into an agreement with OPEC member nations to fix prices.'" Doc. 129 at 12 (quoting *Spectrum Stores*, 632 F.3d at 951). The Court disagrees.

To be sure, Plaintiffs alleged that OPEC engaged in a price war with Defendants, signaled that they would be open to Defendants' production restraints, and, at times, attended or organized events at which Defendants were present. *See* Doc. 86 ¶¶ 105, 112, 122. But the Court need not adjudicate the legality of OPEC's actions or rule on the propriety of a foreign sovereign's participation in the cartel. Read fairly, Plaintiffs' claimed injuries flow from Defendants' purported agreement amongst themselves to "coordinate, and ultimately constrain, domestic shale oil production . . . ." *Id.* ¶ 1. Plaintiffs may rely on OPEC's actions for context without requiring a judicial determination regarding any of its members' conduct. *See id.* ¶¶ 1, 16, 162, 261 (alleging an agreement existed between Defendants to coordinate domestic shale oil production). Accordingly, at trial, the fact-finder would not need to conclude that Defendants entered into an agreement with OPEC member nations to fix prices as a condition precedent for finding liability.

The jury question is whether Defendants conspired with each other to restrain output and inflate prices. Dismissal pursuant to the political question doctrine is therefore not warranted.

Defendants cited authority—*D'Augusta* and *Spectrum Stores*—do not alter the Court's conclusion. *See* Doc. 129 at 25-27 (relying on *Spectrum Stores,* 632 F.3d 938, and *D'Augusta v. American Petroleum Institute*, 117 F.4th 1094 (9th Cir. 2024)); Doc. 191 at 6-9. Neither of those decisions is controlling or persuasive.

*D'Augusta* involved allegations that private oil industry defendants "colluded with the U.S. government, including then-president Trump, to negotiate with Russia and Saudi Arabia to end their price war on oil." 117 F.4th at 1098. As the Ninth Circuit explained, "[a]t bottom, Plaintiffs contend that President Trump improperly negotiated an end to an international price war." *Id.* at 1101. This litigation is materially different. Plaintiffs do not ask this Court to determine the legality of governmental negotiations with other countries or judicially review foreign relations. Indeed, *D'Augusta* distinguished between claims requiring adjudication of foreign policy and others involving solely "private conduct among [non-OPEC-related] Defendants." *Id.* at 1103-04. The Ninth Circuit concluded that it "ha[d] jurisdiction to address these allegations of private conduct" even though it found them inadequately pleaded. *Id.* at 1104.

The *Spectrum Stores* decision is also distinguishable. There, the Fifth Circuit ruled that "the complaints before [it] effectively challenge the structure of OPEC and its relation to the worldwide production of petroleum." 632 F.3d at 943. Indeed, "[t]he Spectrum Appellants accuse[d] Citgo of conspiring with OPEC member nations[,]" and "Citgo [was] wholly owned by Venezuela, through PDVSA, the national oil company of Venezuela." *Id.* at 944. The consolidated complaint in that case further alleged that the claimed conspiracy was carried out through oil production companies that were owned by foreign countries or their subsidiaries. *Id.* at 947. Given

those facts, the Fifth Circuit "agree[d] with the district court that the core of the alleged conspiracy, as is true of the Spectrum Complaint, consist[ed] of agreements entered into by foreign sovereign states to limit production of crude oil." *Id.* at 947.

None of the features *D'Augusta* or *Spectrum Stores* deemed material are present here. Plaintiffs have not sued a foreign government or a sovereign-owned oil company. They are not asking the Court to regulate OPEC's production decisions or invalidate a foreign government's actions, and no executive branch policy choices are implicated. The alleged antitrust violations are predicated on claims that Defendants conspired to constrain domestic shale oil production. OPEC's alleged role—even as a purported facilitator—does not transform claims of a domestic conspiracy into a trial on the conduct of foreign countries or on policy decisions made by coordinate branches of the American government.

The *Baker* factors support the Court's conclusion. First, Defendants identify no constitutional provision committing resolution of this dispute to a coordinate political department. They instead point "merely to a general principle, like the executive branch's authority over foreign affairs." Curtis A. Bradley & Eric A. Posner, *The Real Political Question Doctrine*, 75 STAN. L. REV. 1031, 1057 (2023) (providing a post-*Baker* account of the political question doctrine in the lower courts); Doc. 191 at 6 ("[T]he text of the Constitution commits the questions that a trial of this case would present to the Executive Branch (first *Baker* factor)."). But a case does not become nonjusticiable merely because it "touches foreign relations." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 229-30 (1986). Again, assessing whether the domestic Defendants agreed to restrain production of shale oil in contravention of antitrust laws does not require this Court to rule on the propriety of any foreign nation's policy choices.

Second, antitrust laws provide "judicially discoverable and manageable standards for resolving" the case at bar. *Baker*, 369 U.S. at 217. The core question here is whether domestic corporations and individuals conspired to coordinate production cuts. *See* Doc. 86 ¶¶ 261-63. The nation's antitrust laws provide workable standards to resolve that question. *See Japan Whaling Ass'n*, 478 U.S. at 230 (concluding a judicially manageable standard existed because the issue presented was "a purely legal question of statutory interpretation[,]" which called for "applying no more than the traditional rules of statutory construction, and then applying this analysis to the particular set of facts presented below"). Third, the Court need not make an initial policy determination of a kind clearly reserved for nonjudicial discretion. Defendants suggest otherwise and contend that "a ruling here would require this Court to declare that OPEC officials—while visiting the United States—openly flouted this country's laws against the United States' interest[,]" and that this would be wrong because "the executive branch's diplomacy, not the 'far blunter instrument of antitrust litigation,' manages this country's foreign relations." Doc. 191 at 16 (quoting *Spectrum Stores*, 632 F.3d at 953). Perspective matters. From Plaintiffs' point of view, the relevant question is whether Defendants violated antitrust laws by agreeing to constrain their domestic production of crude oil and thereby fix prices in the U.S. Doc. 86 ¶ 1. It is not a question of whether OPEC violated American laws or acted contrary to domestic interests.

The remaining *Baker* factors are similarly inapplicable. *See* 369 U.S. at 217. This case does not require the Court to contradict a political decision already made, disrespect a coordinate branch, or risk embarrassment from conflicting pronouncements by different branches of government. The Court is not being asked to conduct foreign policy. It is being asked to adjudicate domestic antitrust claims against domestic defendants. The political-question doctrine therefore does not warrant dismissal.

### B. Act of State

"In every case in which [courts] have held the act of state doctrine applicable, the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *W. S. Kirkpatrick & Co. v. Env't. Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990). As discussed at length above, that is not the case here. This Court is not being asked to give its imprimatur to any foreign government's conduct or otherwise invalidate such actions. Accordingly, the act of state doctrine is inapplicable.

## II. Pleading Conspiracy: Parallel Conduct & Plus Factors

"To state an antitrust claim under Section 1 of the Sherman Act, a complaint must contain 'enough factual matter (taken as true) to suggest that an agreement was made.'" *In re Credit Default Swaps Auctions Litig.*, 710 F. Supp. 3d 895, 943 (D.N.M. 2023) (quoting *Twombly*, 550 U.S. at 556). A complaint satisfies this requirement with allegations of direct or circumstantial evidence, "whereby circumstantial evidence alleges that the defendants engaged in parallel conduct that suggests a preceding agreement." *In re Credit Default Swaps Auctions*, 710 F. Supp. 3d at 943 (citing *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1177, 1179 (10th Cir. 2019)). "[P]arallel conduct, absent some additional type of contextual evidence, is generally insufficient to nudge an antitrust conspiracy allegation beyond the line from possible to plausible." *Llacua*, 930 F.3d at 1178. Allegations regarding parallel conduct must therefore "be accompanied by additional circumstances, or 'plus factors,' that 'raise[] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.'" *In re Credit Default Swaps Auctions*, 710 F. Supp. 3d at 943 (quoting *Twombly*, 550 U.S. at 553). The CCAC sufficiently pleads parallel conduct and plus factors.

### A. Parallel Conduct

Plaintiffs allege that although oil prices "began increasing at a rapid rate in 2021[,]" each Defendant "limited their domestic shale production growth" rather than increasing production and growing market share. Doc. 86 ¶¶ 13-14. Defendants challenge the substance of these allegations and deny that they demonstrate parallel conduct. They note (1) "that six of the eight defendants increased their U.S. oil production after 2021, and did so at vastly different rates"; (2) that "[o]nly two defendants allegedly reduced their U.S. production after 2021, also at vastly different rates"; and (3) that "[a]t best, plaintiffs allege that defendants' three-year average post-pandemic oil production growth rates were smaller than their three-year average pre-pandemic growth rates, which themselves varied widely." Doc. 129 at 22-24 (emphasis deleted).

The problem with Defendants' position is that it assumes parallel conduct is measured by absolute decreases in production.[19] But in this case, the decreasing relative rate of production serves as the relevant benchmark. *Cf. In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 793 (N.D. Ill. 2017) (explaining lack of absolute increase was not fatal to plaintiffs' theory of the case because there was a decrease relative to past annual rate increases). The crux of Plaintiffs' argument is that Defendants decreased their production relative to their historical growth practices. Doc. 86 ¶ 160 tbl. 1. Indeed, Plaintiffs allege that every Defendant decreased their shale oil production growth rate during the class period compared to their 2017-19 rate of the same. *Id.*

Variations in the degree of reduced production do not invalidate Plaintiffs' claims of parallelism. In *Broiler Chicken*, the court rejected the defendants' contention that a producer would

[19] For example, Centennial/Permian is alleged to have a 2021-2023 U.S. oil production growth rate of 56%. Doc. 86 ¶ 160 tbl. 1. Defendants point out that 56% growth is a positive increase and that Plaintiffs incorrectly claim that Centennial/Permian reduced its production. Doc. 129 at 34-35. That absolute growth, however, constitutes a relative decrease compared to Centennial/Permian's 2017-2019 U.S. oil production growth rate of 123%. Doc. 86 ¶ 160 tbl. 1.

not plausibly agree to "give up 8% of its sales while its rivals gave up only 2%." 290 F. Supp. 3d at 795 (citation modified). It explained that individual firms may begin with distinct market shares, have different amounts to cut, and still benefit from resulting price increases. *Id.* That same reasoning applies here. Plaintiffs allege that Defendants cut production growth, "reap[ed] the rewards" of that conduct through increased revenues, and simultaneously declined to reinvest those revenues into new production.[20] Doc. 86 ¶ 161 figs. 3-10. At this stage, Plaintiffs have put forth a plausible claim that Defendants benefitted from reduced production growth. *See Broiler Chicken*, 290 F. Supp. 3d at 792 ("It is more than plausible that conspirators would leave the precise means of cutting production up to each conspirator, where multiple options would accomplish the intended goal.").

**B. Plus Factors**

Parallel conduct alone is not sufficient to state a plausible claim for relief. "[E]ven conscious parallelism, a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions[,] is not in itself unlawful." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 321 (3d Cir. 2010). To state a viable claim, Plaintiffs must also allege facts that point to an actual agreement "instead of the unilateral, independent conduct of competitors." *Id.* at 323 (citation modified). These

[20] Figures 4 through 10 show each Defendants' annual revenue save for Hess's. *See* Doc. 86 ¶ 161. The lack of a figure for Hess poses no problem for Plaintiffs. First, the CCAC alleges that "Defendants are reaping the rewards[,]" and it states that "[w]here Plaintiffs ascribe an action to 'Defendants,' unless stated otherwise, the action is alleged to have been taken by each of Centennial, Chesapeake, Continental, Diamondback, EOG, Hess, Occidental, Pioneer, aided and abetted by Individual Defendants Sheffield and Hess." *Id.* ¶¶ 161, 82. The Court takes this as true. Hess—and any other Defendants—can argue to the contrary in a summary judgment motion. Second, Hess's U.S oil production growth rate from 2017-2019 is allegedly 25%, and their 2021-2023 rate of the same is alleged to be negative 6%. Doc. 86 ¶ 160 tbl. 1. This drop in production with rising prices, which Hess allegedly benefited from, is enough to find it plausible that Hess had enough to gain in this conspiracy.

additional allegations, commonly referred to as "plus factors," show "economic actions and outcomes that are largely inconsistent with unilateral, lawful conduct but largely consistent with explicitly coordinated action." *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 915 (N.D. Cal. 2019) (internal quotation marks omitted) (quoting *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015)). Plus factors may include "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, evidence of a high level of interfirm communications," and allegations that "the defendants have been uniform in their actions." *Hendershot v. S. Glazer's Wine & Spirits of Okla., LLLP*, Case No. 20-cv-0652, 2021 U.S. Dist. LEXIS 148676, at *21 (N.D. Okla. Aug. 9, 2021) (citation modified). "These factors, however, are 'neither exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might permit a jury to infer the existence of an agreement.'" *Crownalytics, LLC v. SPINS LLC*, Case No. 22-cv-01275, 2024 U.S. Dist. LEXIS 85478, at *18 (D. Colo. May 10, 2024) (quoting *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016)).

Here, Plaintiffs point to several alleged plus factors, such as market conditions, opportunities for Defendants to collude, interfirm communications, horizontal shareholding, and actions against self-interest. As explained below, considered collectively and in the light most favorable to Plaintiffs, the Court finds that those allegations plausibly support an inference that Defendants' parallel production restraint reflected an agreement.

**1. Market Conditions**

Plaintiffs identify market conditions that they allege render the crude oil market especially susceptible to collusion, including market concentration and inelastic demand. Doc. 86 ¶ 190. They describe the U.S. shale oil industry as one that "is highly fragmented at the bottom but consolidated

at the top, with a small number of much larger producers and hundreds of smaller producers." *Id.* ¶ 192. In support, they note that "of the 247 companies operating oil rigs in the U.S., 162 companies are running just one rig" and "[o]nly 10 companies own 15 or more rigs – five are Defendants (EOG, Occidental, Pioneer, Diamondback, and Continental), and three of the other five are current or former supermajors (Exxon, Chevron, and ConocoPhillips Company)." *Id.* ¶ 167. In addition to this top-heavy concentration, Plaintiffs note the inelastic demand for crude oil, stating that oil "is a daily-use commodity that has no substitute for many purchasers and high switching costs for the remainder, leading to highly inelastic demand." *Id.* ¶ 190.

Defendants respond that these market conditions do not give rise to a conspiracy inference. They assert that "contrary to plaintiffs' allegations, the highly fragmented nature of the shale oil industry does not favor collusion—it does the opposite"—and "market fragmentation renders collusion less likely." Doc. 129 at 38 (emphasis deleted). Defendants also contend that inelastic demand is not dispositive and does not, by itself, "constitute a plus factor that makes the existence of a conspiracy plausible." *Id.* They further claim that "while a market characterized by high concentration, high entry barriers, and an inelastic demand for the product might be susceptible to conspiracy[,]" they could also facilitate permissible parallel conduct. *Id*. (citing *Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 2016 WL 4574357, at *5 (S.D. Cal. July 14, 2016)).

Defendants' arguments have some appeal. Market concentration and inelastic demand may facilitate a permissible follow-the-leader approach and do not prove collusion. The question at this stage of the litigation, however, is whether these conditions, considered alongside the CCAC's other allegations, plausibly support an inference of an agreement. *See Brown v. JBS USA Food Co.*, Case No. 22-cv-02946, 2023 U.S. Dist. LEXIS 173162, at *33-34 (D. Colo. Sept. 27, 2023). The Court finds in the affirmative. A top-heavy market and inelastic demand constitute conditions

in which coordinated production restraint and higher prices would be easier to implement and maintain. *See* Doc. 86 ¶¶ 190-93. Thus, although these market conditions are not independently sufficient to plead agreement, they provide some support for the inference.

Defendants' cited case law supports this approach. In *Text Messaging Antitrust Litigation* (*Text Messaging II*), 782 F.3d 867, 871 (7th Cir. 2015), Judge Posner recognized that market concentration may cut both ways. On the one hand, a small number of producers may facilitate collusion because those firms may "find it safer and easier to fix prices than if there are many competitors of more or less equal size." *Id.* at 871. On the other, those same circumstances are conducive to lawful parallelism. *Id.* Accordingly, market structure is not conclusive. Regardless, at the pleading stage the question is one of plausibility. Drawing all inferences in Plaintiffs' favor, the top-heavy structure of the domestic shale oil industry coupled with inelastic demand supports the claims at issue. *In re Text Messaging Antitrust Litig.* (*Text Messaging I*), 630 F.3d 622, 629 (7th Cir. 2010) (noting the court "need not decide whether the circumstantial evidence that [they] ha[d] summarized [was] sufficient to compel an inference of conspiracy; [for] the case [was] just at the complaint stage and the test for whether to dismiss a case at that stage turns on the complaint's 'plausibility'").

In short, Plaintiffs' allegations regarding market structure and demand are relevant plus factors, though not by themselves dispositive. Market concentration could facilitate collusion, and inelastic demand may result in higher profits from restrained production; decreased supply would result in higher prices though not necessarily lost sales. But, as discussed above, the conditions described also lend themselves to permissible parallel conduct. Viewed against the backdrop of Plaintiffs' other allegations, and given this matter is at the motion to dismiss stage, the Court finds that these factors provide some, albeit modest, support for a plausible inference of conspiracy.

### 2. Opportunities to Collude and Interfirm Communications

Plaintiffs next allege that Defendants engaged in interfirm communications and had opportunities to collude. Such discussions and chances to engage may constitute plus factors. *See Mayor of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 139 (2d Cir. 2013) ("[A] high level of interfirm communications is a potential plus factor allowing a fact-finder to infer a conspiracy . . . ." (citation modified)). The nature and circumstances of those communications are relevant. Indeed, "membership in common trade associations and common attendance of trade shows indicates an opportunity to conspire, but it is not enough, standing alone, to provide the 'plus factors' needed to allege a conspiracy." *PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharm.*, 530 F. Supp. 3d 301, 335 (S.D.N.Y. 2021); *In re Musical Instruments*, 798 F.3d at 1196 ("[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement."); *In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999) ("If we allowed conspiracy to be inferred from such activities alone, we would have to allow an inference of conspiracy whenever a trade association took almost any action."). Courts must distinguish ordinary industry activities from those used as a cloak for unlawful coordination. *PharmacyChecker.com, LLC*, 530 F. Supp. 3d at 335.

Here, Plaintiffs allege more than mere attendance of industry events or the innocent collection of information. As they point out in their response, they identify meetings evincing the sharing of information about fixing production and pricing and engaging in conspiratorial action. Doc. 156 at 32-34; *see* Doc. 86 ¶¶ 112-25, 132-35; *see also* Plaintiffs' Factual Contentions *supra*. Taking those allegations as true, Plaintiffs identify interactions that extend beyond the exchange of standard industry information and give some support for an inference of an agreement.

The FTC-related allegations support that conclusion. In May 2024, the FTC announced that after initiating an investigation of the proposed merger between Exxon Mobil Corporation and Pioneer, it had reached a consent decree with Exxon prohibiting "Pioneer's former-CEO, Individual Defendant Scott Sheffield, from joining Exxon's Board of Directors based on [the] FTC's evidence of Sheffield's years-long efforts to fix the price of crude oil." Doc. 86 ¶ 175; *see also id.* ¶¶ 175-82. Similarly, in September of that same year, the FTC alerted the public that following an investigation of the proposed merger between Chevron Corporation and Hess, it had also entered into a consent decree with Chevron prohibiting John B. Hess from joining Chevron's Board of Directors due to the FTC's belief that he had spent years attempting to fix crude oil's prices. *See id.* ¶¶ 183-88. Both consent decrees followed FTC draft complaints alleging that Sheffield and John B. Hess had extensive communications with and access to OPEC personnel and market rivals.[21] *See id.* ¶¶ 82, 177-79, 185-88.

Taken together, the Court finds that Plaintiffs' allegations regarding corporate communications and the related FTC investigations support a plausible inference that Defendants' conduct was consistent with coordination and not just ordinary industry activity.

---

[21] Defendants and the Hess Defendants each filed notices of supplemental authority noting that the FTC had vacated the consent decrees in connection with Exxon's acquisition of Pioneer and Chevron's of Hess. Doc. 243 at 1; Doc. 244 at 1. But the FTC set these consent orders aside because the draft complaints did not allege that the challenged acquisitions themselves would increase the potential for coordination. The FTC did not reject prior allegations regarding John B. Hess's and Sheffield's communications or efforts. Doc. 244-1 at 7 (discussing how the complaint did not contain allegations that the challenged acquisition itself increased the potential for coordination. Rather, "its allegations focus exclusively on the statements and communications from . . . Mr. Hess. Mr. Hess's alleged statements by themselves do not establish that *this acquisition* will affect the potential for coordination in a way that substantially lessens competition, and, therefore, cannot support a coordinated effects case"); Doc. 243-1 at 8 (arriving at the same conclusion as Doc. 244-1 but regarding Sheffield).

### 3. Horizontal Shareholding

Plaintiffs further point to Defendants' horizontal shareholding as a plus factor.[22] They allege that "Defendants' core shareholders overlap substantially (with Continental, which founder Howard Hamm took private in 2022, [being] the lone exception)." Doc. 86 ¶¶ 197-98. According to Plaintiffs, this common ownership "creates an additional factor enabling and facilitating Defendants' agreed output restrictions."[23] *Id.* ¶ 198. Specifically, Plaintiffs assert that overlapping ownership (1) allowed for communications that facilitated "coordinated output restriction[s]"; (2) helped to enforce the collusive agreement; and (3) disincentivized competition. *Id.* ¶¶ 199-201.

Defendants challenge Plaintiffs' contentions and assert that common ownership "does not constitute a plus factor that would make plaintiffs' purported conspiracy plausible." Doc. 129 at 40. They emphasize that the CCAC lacks allegations that the ownership groups, six investment firms, communicated with each other regarding shale oil production or that they worked to stymie Defendants' competitive behavior. *Id.* at 40-41. Defendants are correct that the presence of overlapping investors does not, by itself, prove an anti-competitive agreement.

The Court, however, understands Plaintiffs' allegations regarding horizontal ownership to address structural conditions that, when considered with production restraints and other plus factors, make the alleged agreement more plausible. "Economic theory has long shown that

---

[22] The CCAC alleges that seven of the eight corporate defendants are partly owned by BlackRock Inc., State Street Corp., and Vanguard Group, Inc., and that four of the eight are also partly owned by FMR, LLC (Fidelity). Doc. 86 ¶ 197.

[23] Plaintiffs refer to this overlapping as "common investor ownership" or simply "Defendants' [c]ommon [o]wnership . . . ." Doc. 86 ¶ 198; *see also* Doc. 156 at 28. The Court uses the term "horizontal shareholding." Einer Elhauge, *How Horizontal Shareholding Harms Our Economy—and Why Antitrust Law Can Fix It*, 10 HARV. BUS. L. REV. 207, 209 n.1 (2020); Einer Elhauge, *Horizontal Shareholding*, 129 HARV. L. REV. 1267 (2016) ("Horizontal shareholdings exist when a common set of investors own significant shares in corporations that are horizontal competitors in a product market.").

horizontal shareholdings can reduce the incentives of horizontal competitors to compete with each other"; the anticompetitive incentives and effects that emerge from horizontal shareholdings do not "require[] any management-shareholder communication" or "that the managers of the [] firms communicate or coordinate with each other"; and "it suffices that institutional investors have incentives to fail to exercise their corporate-governance rights in a way that demands maximizing individual corporate performance over industry performance." *See* Elhauge, *Horizontal Shareholding*, at 1268, 1270 (emphasis deleted). The Court does not treat horizontal shareholding as direct evidence of an agreement, but at this point in the proceedings, these allegations provide some (limited) support for Plaintiffs' contentions that Defendants had reduced incentives to increase production of shale oil. This serves as a plus factor.

**4. Actions Against Self-Interest**

Finally, Plaintiffs claim that Defendants acted against their self-interest in restraining shale oil production growth during the proposed class period. *See* Doc. 86 ¶ 204. This consideration requires Plaintiffs to plausibly allege that "the defendants' behavior would not be reasonable or explicable (i.e., not in their legitimate economic self-interest) if they were not conspiring to fix prices or otherwise restrain trade—that is, that the defendants would not have acted as they did had they not been conspiring in restraint of trade." *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 989 (N.D. Ohio 2015) (citation modified) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 572 (11th Cir. 1998)). The salient feature is "behavior that is inconsistent with a competitive market." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 399 (3d Cir. 2015).

Here, the CCAC contains allegations regarding Defendants' production decisions that are inconsistent with a competitive market. For example, Plaintiffs claim that although Defendants'

breakeven price for shale oil fell from $82 in 2014 to $37 by 2021, they "limited their domestic shale production growth." Doc. 86 ¶¶ 106, 114. Plaintiffs also allege that Defendants had excess capacity but maintained "a self-imposed restraint" on output. *Id.* ¶ 210. Separately, Plaintiffs assert that communications regarding production information and the corresponding disclosure of "proprietary and sensitive information with a direct competitor" were irrational. *Id.* ¶¶ 206-09.

Defendants provide alternative explanations for their actions such as the "slow emergence from the throes of the pandemic," "market volatility following Russia's military invasion of Ukraine," and a price war with OPEC. Doc. 129 at 41. Those arguments may ultimately prove to be true. But Plaintiffs do not at this stage need to "rule out all possible innocent explanations." *In re Generic Pharms. Pricing Antitrust Litig.*, Case No. 16-md-2724, 2023 U.S. Dist. LEXIS 31649, at *31 (E.D. Pa. Feb. 27, 2023). For now, the Court must determine whether Plaintiffs have plausibly alleged that, absent coordination, each of the Defendants had rational incentives to expand shale oil production more aggressively than they did. *See Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d at 989. The Court finds that Plaintiffs have met this burden.[24]

**C. Conclusion**

Parallel conduct and plus factors are not viewed in isolation. The allegations must be read holistically. *JBS USA Food Co.*, 2023 U.S. Dist. LEXIS 173162, at *35. As other courts have

---

[24] The Tenth Circuit's decision in *Llacua v. Western Range Association* further illustrates this point. 930 F.3d 1161 (10th Cir. 2019). There, shepherds brought an antitrust claim alleging the defendants "conspired and agreed to fix wages offered and paid to shepherds at the minimum [Department of Labor] wage floor." *Id.* at 1168. The court rejected the plaintiffs' assertions of action against self-interest because they presented no facts asserting the defendant ranches needed to offer wages above the regulatory minimum "to attract a sufficient number of qualified workers." *Id.* at 1181. Indeed, "[a]ssuming a sufficient supply of qualified labor is available at this [lowest] wage, no rancher would be logically inclined to offer more." *Id.* Plaintiffs allege different facts here. They contend Defendants' decision to withhold production in the face of increasing crude-oil prices, decreasing breakeven costs, and excess production capacity was contrary to economic self-interest. *See* Doc. 86 ¶¶ 106, 114, 204-13.

noted, "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1078 (N.D. Ill. 2011) (internal quotation marks omitted) (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). Here, the Court concludes that Plaintiffs' allegations of parallel conduct—i.e., reduced relative output of shale oil production—when read in combination with allegations addressing market structure, communications, common ownership, and anomalous output decisions, are sufficient to nudge Plaintiffs' conspiracy claims from possible to plausible. *Tarasov v. Amazon.Com Servs. LLC*, Case No. 2:25-cv-00616, 2025 U.S. Dist. LEXIS 222911, at *4 (D. Utah Nov. 12, 2025) ("To survive a motion to dismiss, the plaintiff must 'nudge' the 'claims across the line from conceivable to plausible.'" (quoting *Twombly*, 550 U.S. at 570)).

**III. Antitrust Standing**

Plaintiffs allege that Defendants violated Section 1 of the Sherman Act by agreeing to price fix.[25] Doc. 86 ¶¶ 260-65. For that alleged violation, they seek injunctive relief enjoining Defendants from continuing their anticompetitive actions. *Id.* ¶ 265. They also seek damages under

[25] Defendants argue that Plaintiffs cannot seek injunctive relief against Pioneer or Hess because they do not plead ongoing misconduct. Doc. 129 at 43-44. That is incorrect. Plaintiffs allege that "[f]rom at least January 1, 2021, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy" to unlawfully restrain their shale oil production and fix prices. Doc. 86 ¶ 261; *supra* Sections I-II. Defendants point out that Exxon acquired Pioneer, Chevron was seeking to acquire Hess (and now has), and that both acquirers "have committed to expand shale oil production." Doc. 191 at 28 (citing Doc. 86 ¶ 165). These are fair but unpersuasive points. Nothing suggests that similar personnel, strategies, and cultural values did not accompany the targets (Hess and Pioneer), which in turn would make plausible that the specific harms alleged throughout the CCAC continue today. This is especially true now that the FTC vacated the Orders restricting John B. Hess's and Sheffield's participation on Chevron's and Hess's boards, respectively. Docs. 243-44.

various state antitrust and consumer protection laws. *Id.* ¶¶ 274-385. Defendants respond that Plaintiffs lack antitrust standing to pursue their claims. Doc. 129 at 44-49.

Antitrust standing is distinct from its constitutional counterpart, and its requirements "are more rigorous than [those] of the Constitution." *Tal v. Hogan*, 453 F.3d 1244, 1253 (10th Cir. 2006). To establish antitrust standing, Plaintiffs must demonstrate an antitrust injury and show "a direct causal connection between that injury and a defendant's violation of the antitrust laws." *JetAway Aviation, LLC v. Bd. of County Comm'rs*, 754 F.3d 824, 833 (10th Cir. 2014) (Holmes, J., concurring) (citation modified). Relevant considerations, commonly referred to as the *AGC* factors,[26] include:

> (1) the causal connection between the antitrust violation and the plaintiff's injury; (2) the defendant's intent or motivation; (3) the nature of the plaintiff's injury—i.e. whether it is one intended to be redressed by the antitrust laws; (4) the directness or the indirectness of the connection between the plaintiff's injury and the market restraint resulting from the alleged antitrust violation; (5) the speculative nature of the damages sought; and (6) the risk of duplicative recoveries or complex damages apportionment.

*Sharp v. United Airlines, Inc.*, 967 F.2d 404, 406-07 (10th Cir. 1992) (citations omitted). The *AGC* factors, however, are not a checklist, and there are no "black-letter rules about antitrust standing." *Id*. The application of these factors depends on the relief sought. Indeed, damages-related *AGC* issues—those pertaining to the speculative nature of the damages and risk of duplicative recovery or complex damages apportionment—are immaterial to Plaintiffs' injunctive relief claims. *See B-S Steel of Kan. v. Tex. Indus.*, 439 F.3d 653, 666-68 (10th Cir. 2006). The Court therefore considers

[26] The factors are named for the Supreme Court decision from which they originated. *See Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*").

the first four *AGC* factors as to Plaintiffs' injunctive relief claims and all six of the factors to the extent they are relevant to Plaintiffs' state law claims.[27]

**A. Factors 1 and 4: Causal Connection and Directness**

The first and fourth *AGC* factors address whether Plaintiffs plausibly allege that their injuries stemmed from Defendants' antitrust violations and the directness of the connection between the injury and that conduct. *See Sharp*, 967 F.2d at 406-07. These considerations overlap and so the Court considers them together. *Davis v. Hanna Holdings, Inc.*, 771 F. Supp. 3d 552, 577 (E.D. Pa. 2025) ("Because the question of directness can absorb the question of causal connection, courts sometimes consider these factors together." (citation modified)).

Defendants argue that Plaintiffs' injuries are so attenuated from the claimed unlawful conduct that dismissal is required. Doc. 129 at 46. They offer several contentions in support. For example, they emphasize that they "account[ed] for less than 2% of global crude oil production" and therefore lacked the requisite market power to create supracompetitive prices for crude oil derivative products. *Id.* In addition, Defendants note that Plaintiffs do not directly purchase crude oil from them, trace their purchases through the web of distribution, nor connect their purchases

[27] When indirect purchasers seek damages under states' antitrust laws, courts must sometimes determine whether the relevant state law incorporates the Supreme Court's decision in *AGC*, or instead, applies a different standard. *See Broiler Chicken*, 290 F. Supp. 3d at 814-15 ("In deciding whether to apply *AGC* to state-law antitrust claims, the Court will look to whether the relevant state high court or state legislature has spoken on the issue."). The parties disagree on which states incorporate *AGC*. *Compare* Doc. 156 at 45 (arguing that the *AGC* factors do not apply at all in many states), *with* Doc. 129 at 45 ("The *AGC* analysis applies equally to plaintiffs' federal and state law claims because the states on whose laws plaintiffs base their claims have adopted *AGC* or a similar analysis."). Because Plaintiffs satisfy the six *AGC* factors, at this stage of the proceeding, the Court need not resolve the question of which states' laws incorporate *AGC* and which of those apply a less demanding standard. *In re Fragrance Direct Purchaser Antitrust Litig.*, 2025 U.S. Dist. LEXIS 31603, at *47 (D.N.J. Feb. 21, 2015) ("[T]he Court finds that Plaintiffs' claims satisfy *AGC*, and accordingly does not reach the question of which states apply the AGC Test and which apply some lower standard.").

to Defendants' crude oil production. *Id.* at 46 ("Plaintiffs do not allege that they bought anything from defendants, nor do they plead that any of the refined petroleum products that they bought were derived from the relatively small amount of crude oil that defendants produced."); *id.* ("Plaintiffs fail to trace the purportedly elevated prices of defendants' shale oil through the vast and complex manufacturing and distribution supply chain to the prices that plaintiffs ultimately paid to third-party retail merchants for refined petroleum products."). Finally, they contend that the direct crude oil purchasers are better suited to raise the claims presented. *Id.* at 48 ("Indeed, the existence of an identifiable class of persons whose self-interest would normally motivate them to sue—e.g., defendants' direct crude oil customers—defeats any justification for allowing a more remote party to assert a claim." (citation modified)).

Plaintiffs' theory of the case, however, is that Defendants participated in a "conspiracy to coordinate, and ultimately constrain, domestic shale oil production," which unlawfully raised the prices of crude oil and inevitably its derivative products. Doc. 86 ¶¶ 1-2. It is not conditional on tracing purchased derivative products to specific barrels of Defendant-produced crude oil. The question is whether Plaintiffs plausibly allege that Defendants conspired to restrain shale oil production and that the conspiracy resulted in inflated prices for oil derivative products.

The Court finds that Plaintiffs have made allegations sufficient to meet their burden. Plaintiffs contend that "U.S. Shale Producers, including Defendants, traditionally acted as 'swing producers' for the global oil market, with the ability to adjust shale oil production levels rapidly in response to changes in market conditions and push, or 'swing,' the price of crude oil," and in that capacity, Defendants "should have increased production to capitalize on [the January 2021] price rise if acting as rational profit maximizers." *Id.* ¶¶ 8-9. They also allege that Defendants control 18% of the total active oil rigs in the U.S.," produced in 2023 "approximately 16.2% of U.S. total

crude oil production (including conventional crude oil)[,]" and are five of the ten companies operating oil rigs in the U.S. that own fifteen or more rigs. *Id.* ¶ 167. Taking those allegations as true, Plaintiffs plausibly state that Defendants were "able to leverage their collective market share" to affect crude oil prices. *Id.*

The CCAC has a number of allegations explaining the connection between inflated crude oil prices and bloated prices of gasoline, diesel fuel, marine fuel, heating oil, and jet fuel. Specifically, Plaintiffs allege that gasoline prices are largely a function of crude oil prices, and that gasoline prices react more slowly to decreases in crude oil prices than increases. *Id.* ¶¶ 230-32. Plaintiffs have pleaded that the alleged conspiracy increased the costs of other derivative oil products including marine fuel, heating oil, and jet fuel. *Id.* ¶¶ 237-47. At the pleading stage, those allegations are sufficient for purposes of *AGC*'s first and fourth factors.

That Plaintiffs did not purchase crude oil from Defendants or trace their purchases of oil-derivative products to Defendants' production does not defeat their claim. Plaintiffs assert that Defendants' purported restraint of shale oil production predictably increased the prices Plaintiffs paid for gasoline and related products. *See* Doc. 86 ¶ 234 ("Because crude oil is the main raw material used to refine gasoline sold in the United States, Defendants' conspiracy had a direct effect on Plaintiffs and members of the Classes who were forced to purchase gasoline at artificially inflated levels."). This is a sufficiently direct throughline between Defendants' alleged conduct and their injury. Plaintiffs have met their burden for purposes of *AGC* factors 1 and 4.

**B. Factors 2 and 3: Nature of Plaintiffs' Injury and Defendants' Intent**

Next, the Court considers the second and third *AGC* factors, which address Defendants' intent and whether Plaintiffs' injury is one intended to be redressed by the antitrust laws. *Sharp*, 967 F.2d at 406-07. Again, there is significant overlap between these considerations and the *AGC*

factors bearing on causality and directness. And as explained above, Plaintiffs have plausibly alleged that Defendants conspired to restrain production of crude oil, which resulted in Plaintiffs paying higher prices for derivative products. The conduct and result are quintessential interests our nation's antitrust laws are designed to protect, and the conduct is sufficiently connected. *See, e.g.*, *Ashton Woods Holdings LLC v. USG Corp. (In re Domestic Drywall Antitrust Litig.)*, Case No. 13-md-2437, 2019 U.S. Dist. LEXIS 172396, at *31 (E.D. Pa. Oct. 3, 2019) (holding that financial injury caused by conspiracy-induced artificially inflated prices are the type of injury the antitrust laws were designed to protect); *Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1564 (7th Cir. 1991) ("[A]ntitrust injury means injury from higher prices or lower output, the principal vices proscribed by the antitrust laws." (citation modified)).

The *Supreme Auto* and *In re Dynamic Random Access Memory* ("*DRAM*") cases do not support a different result. *Supreme Auto Trans. LLC v. Arcelor Mittal*, 238 F. Supp. 3d 1032 (N.D. Ill. 2017); *In re DRAM Antitrust Litig.*, 516 F. Supp. 2d 1072 (N.D. Cal. 2007). Those matters involved many finished goods containing numerous components and inputs. Thus, it was nearly impossible to separate the effects of the defendants' conduct on consumer prices. For example, in *Supreme Auto*, the plaintiffs alleged that the large U.S. steel producer defendants constrained production to artificially increase steel prices, hurting the plaintiffs who purchased "a panoply of consumer products containing steel, including refrigerators, dishwashers, ovens, automobiles, air conditioner units, lawn mowers, and farm and construction equipment." 238 F. Supp. 3d at 1037. These "products that plaintiffs purchased contained a wide variety of materials, each of which influences the retail price and cannot easily be segregated and priced after the fact." *Id.* at 1040. Similarly in *DRAM*, the plaintiffs were end-use purchasers of electronic products containing DRAM, but "each product in which DRAM is a component contains numerous other components,

all of which collectively determine the final price actually paid by plaintiffs for the final product." 516 F. Supp. 2d at 1092 (emphasis deleted). Here, by contrast, crude oil is the principal input for its products, and the prices of those products are largely a function of crude oil prices.[28] Doc. 86 ¶¶ 230-32, 237-47.

Plaintiffs allege that Defendants conspired to restrain crude oil production in order to artificially raise its price, which resulted in inevitable corresponding increases in the prices of oil derivative products. Plaintiffs therefore allege an injury that is not merely incidental to Defendants' conduct but is the predictable result from that claimed conspiracy. This is the type of injury that the antitrust laws were enacted to protect against. At this juncture, the Court finds that Plaintiffs satisfy the second and third *AGC* factors.

### C. Factors 5 and 6: Speculative or Duplicative Damages and Complex Apportionment

The fifth and sixth *AGC* factors concern whether Plaintiffs' damages are speculative in nature and assess the "risk of duplicative recoveries or complex damage apportionment." *In re Cattle & Beef Antitrust Litig.*, 687 F. Supp. 3d 828, 837 (D. Minn. 2023). Pointing to these considerations, Defendants argue dismissal is warranted because, in their view, "there is a risk either that defendants would be subjected to duplicative damages or that the Court would need to engage in the complex process of apportioning damages among potential plaintiffs at different levels of the distribution chain." Doc. 129 at 49. For now, the Court categorizes these issues as minimal and manageable. Although Plaintiffs' theory may ultimately require proof regarding pass-through and damages, there are quantitative means of addressing those considerations. *See, e.g.*,

[28] *DRAM* and *Supreme Auto* also demonstrate that Plaintiffs' injuries are sufficiently caused by Defendants' actions and that "the connection between [] [P]laintiffs' injury and the market restraint resulting from the alleged antitrust violation" is direct enough. 516 F. Supp. 2d 1072; 238 F. Supp. 3d 1032; *Sharp*, 967 F.2d at 407.

*Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 793 (6th Cir. 2002) ("[R]egression analyses . . . are generally accepted methods for proving antitrust damages."); *In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 213 (E.D. Pa. 2017) ("Regression analysis has become increasingly common in antitrust litigation" and serves as "a method of determining damages"). And Defendants have not demonstrated, on the pleadings, that the risk of duplicative recovery or issues of damages apportionment are sufficiently problematic to defeat antitrust standing. Accordingly, for now, consideration of the fifth and sixth *AGC* factors do not warrant dismissal.

### D. Conclusion

After considering the *AGC* factors, the Court finds that Plaintiffs have plausibly alleged sufficient facts to establish antitrust standing. They claim Defendants conspired to restrain crude oil production and that they paid supracompetitive prices for oil derivative products. At this stage of the litigation, Defendants' concerns regarding antitrust standing do not call for dismissal.

## IV. Plaintiffs' Various State Law Claims[29]

Defendants seek dismissal of various state law claims on several grounds. The Court addresses those arguments in turn.

### A. Standing to Assert Claims Under West Virginia Law (Count 53)

Defendants argue that Plaintiffs are prohibited from asserting a claim under the West Virginia Antitrust Act because no named plaintiff resides in or made purchases in that state. Doc. 129 at 51. But the named Plaintiffs allege a cognizable injury flowing from the claimed conspiracy

---

[29] The parties present only perfunctory arguments as to the viability of Plaintiffs' various state law claims. The Court has therefore been required to undertake the difficult work of doing much analysis on its own. In the future, arguments not fully briefed will not be considered. *United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) (declining to consider "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation" (citation modified)); *see also U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (noting the court need not consider "perfunctory and underdeveloped" arguments).

to restrain crude oil production and the corresponding price inflation. *See* William B. Rubenstein, 1 Newberg & Rubenstein on Class Actions § 2:2 (6th ed. 2022) (noting the relevant inquiry is whether each "named plaintiff ha[s] a justiciable claim"). "The subsequent question of who the named plaintiff[s] might then represent, or litigate on behalf of, is properly reserved for the commonality, typicality, and adequacy inquiries under Rule 23." *Id.* Accordingly, given the limited briefing on this issue, the Court declines to dismiss the West Virginia claim (Count 53).

### B. Indirect Purchasers Bringing Class Action or Consumer Protection Claims Under Illinois, Montana, and South Carolina Law (Counts 15, 16, 29, 47)

Defendants contend that state law bars Plaintiffs from "bringing antitrust or consumer protection class action suits under the laws of Illinois, Montana, and South Carolina[,]" and therefore the Court should dismiss Counts 15, 16, 29, and 47. Doc. 129 at 52. The Court disagrees. Rule 23 controls the propriety of maintaining a class action in federal court unless application of the rule would run afoul of the Rules Enabling Act, 28 U.S.C. § 2072. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398, 406-10 (2010) (plurality opinion); *id.* at 416-31 (Stevens, J., concurring in part); *see also James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1217-18 (10th Cir. 2011). The three states' laws at issue here do not limit the scope of the substantive rights at issue; they merely address the process for resolving claims. *Compare Shady Grove*, 559 U.S. at 416-24 (Stevens, J., concurring in part)[30] (agreeing the New York law at issue was a procedural rule and "not part of New York's substantive law"), *with* 740 Ill. Comp. Stat. 10/7, *and* Mont. Code. Ann. § 30-14-133(1)(a), *and* S.C. Code. Ann. § 39-5-140(a). The Court therefore declines to dismiss Counts 15, 16, 29, or 47 on this basis.

---

[30] The Tenth Circuit looks to Justice Stevens's concurrence for guidance on whether a federal rule or state law governs. *James River Ins. Co.,* 658 F.3d at 1217 (citing *Garman v. Campbell Cnty. Sch. Dist. No. 1,* 630 F.3d 977, 983 n.6 (10th Cir. 2010)).

### C. Indirect Purchaser Actions in Colorado and New Jersey (Counts 8 and 36)

Under both Colorado and New Jersey state law, courts generally presume that a statute operates prospectively. *City of Colo. Springs v. Powell*, 156 P.3d 461, 464 (Colo. 2007) ("Absent legislative intent to the contrary, [the Court] presume[s] a statute operates prospectively."); *James v. N.J. Mfrs. Ins. Co.*, 216 N.J. 552, 563 (N.J. 2014) ("[S]tatutes should generally be given prospective application." (citation modified)). Plaintiffs identify no statutory language or other evidence suggesting that general understanding does not apply here, and the *Hard Disc Drive* decision, which interprets Rhode Island law, does not alter the analysis.[31] *See* Doc. 156 at 60; *In re Hard Disc Drive Suspension Assemblies Antitrust Litig.*, Case No. 19-md-02918, 2021 U.S. Dist. LEXIS 181286, at *32-33 (N.D. Cal. Sep. 22, 2021). Therefore, the Court dismisses counts 8 and 36 to the extent they seek recovery for conduct predating June 7, 2023, and August 5, 2022, respectively. Doc. 191 at 37.

### D. In-State Conduct or Injury Sufficient to State a Claim Under the Alabama, Mississippi, and West Virginia Antitrust Laws (Counts 3, 27, 53)

Defendants seek dismissal of Alabama, Mississippi, and West Virginia (again) state law claims, asserting that the CCAC lacks sufficient allegations of anticompetitive conduct within those states. Doc. 129 at 53-55. The Court agrees as to Alabama. Its antitrust statute limits actionable conduct to that which primarily occurs within the state; it does not extend to anticompetitive activity predominantly crossing state boundaries. *See Abbott Lab. v. Durrett*, 746 So. 2d 316, 339 (Ala. 1999) (holding that "§ 6-5-60 does not provide a cause of action for damages allegedly resulting from an agreement to control the price of goods shipped in interstate commerce"). Because Plaintiffs' allegations concern an interstate conspiracy to restrain domestic

---

[31] There, the district court declined to dismiss the claim only because the complaint's language left open the possibility that the named plaintiff purchased the laptop in Rhode Island after the relevant 2013 amendment. *See Hard Disc Drive*, 2021 U.S. Dist. LEXIS 181286, at *32-33.

shale oil production and inflate prices throughout the United States, it is not cognizable under existing Alabama precedent. Count 3 is therefore dismissed.

The Court will not, however, dismiss Counts 27 or 53. Plaintiffs allege that Defendants' conspiracy affected transactions within each state and caused injury therein.[32] These allegations are, at this stage of the litigation, sufficient under Mississippi's and West Virginia's state laws. *Blue Cross v. Teva Pharm. Indus., Ltd.*, 712 F. Supp. 3d 499, 548 (D. Vt. 2024) (adopting majority view that plaintiffs "have sufficiently pled intrastate activity where they allege nationwide antitrust violations, the antitrust impact of which was felt within each state" and applying it to permit the plaintiffs' Mississippi and West Virginia claims to proceed (citing *In re Loestrin 24 Fe Antitrust Litig.*, 410 F. Supp. 3d 352, 375 (D.R.I. 2019))); *State ex. rel. Fitch v. Yazaki N. Am., Inc.*, 294 So. 3d 1178, 1190-91 (Miss. 2020) (explaining that at least some transactions must occur wholly within Mississippi but that interstate conduct allegations will not bar a claim under the act). Plaintiffs may proceed on Counts 27 and 53.

### E. Statutory Notice Requirements in Arizona, Colorado, Connecticut, Hawaii, Nevada, New York, Rhode Island, and Utah (Counts 4, 8, 10, 14, 32, 39, 45, 51)

Plaintiffs initially failed to serve notice of their lawsuit and a copy of the CCAC to

---

[32] *See, e.g.*, Doc 86 ¶ 89 ("[E]ach Defendant: (a) transacted business throughout the United States"; "(b) has manufactured, sold, shipped, and/or delivered substantial quantities of shale oil throughout the United States"; "(c) has substantial contacts with the United States"; "and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States . . ."); *id.* ¶ 1 ("This action arises from Defendants' conspiracy to coordinate, and ultimately constrain, domestic shale oil production, which has had the effect of fixing, raising, and maintaining the price of crude oil, and thereby the price paid by end-users of oil-derivative products . . . in and throughout the United States of America."); *id.* ¶ 91 ("Defendants' unlawful activities substantially affected commerce throughout the United States . . . . Defendants, directly and through their agents, engaged in activities affecting all states."); *id.* ¶ 263 ("Prices for crude oil sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, noncompetitive levels throughout the United States . . . .").

Arizona's, Colorado's, Connecticut's, Hawaii's, Nevada's, New York's, Rhode Island's, and Utah's attorneys general. Doc. 156-3 at 2-3. In March 2025, however, Plaintiffs provided the required notice. *Id.* That corrected misstep does not warrant dismissal of Counts 4, 8, 10, 14, 32, 39, 45, or 51.[33]

### F. Plaintiffs Who Made Purchases for Business or Commercial Purposes as Plaintiffs Under the Consumer Protection Statutes of the District of Columbia, Minnesota, Missouri, Montana, and Nevada (Counts 12, 26, 28, 29, 33)

Defendants argue that the consumer protection statutes of the District of Columbia, Minnesota, Missouri, Montana, and Nevada should be dismissed because those laws "permit suits only by consumers, not by business entities or other persons purchasing goods and services for commercial, as opposed to personal or household, use." Doc. 129 at 55.

The Court declines to dismiss the District of Columbia and Minnesota claims for common reasons. The D.C. Court of Appeals has explained that a transaction generally falls within the District of Columbia Consumer Protection Procedures Act ("DCCPA") when a purchaser acquires goods as a consumer rather than for resale. *Adam A. Weschler & Son, Inc. v. Klank*, 561 A.2d 1003, 1005 (D.C. 1989); *Julian Ford v. ChartOne, Inc.*, 908 A.2d 72, 83-84 (D.C. 2006). Kevin Allen alleges that he purchased gasoline to support his photography business—Kevin Allen

---

[33] The cases Defendants cite are inapposite. The *In re Santa Fe Natural Tobacco Company* case involved a statute allowing a consumer to qualify "for class-action relief only when a supplier acts in the face of prior notice that its conduct was deceptive." *In re Santa Fe Natural Tobacco Co. Mktg. & Sales Practices & Prods. Liab. Litig.*, 288 F. Supp. 3d 1087, 1253 (D.N.M. 2017). The plaintiffs there failed because they did not plead "a specific court decision or Attorney General adopted rule to put the Defendants on notice." *Id.* The instant matter's requirements generally concern ensuring the relevant attorneys general are aware of the suit, not whether Defendants have notice. *See* Doc. 129-4 at 1 (explaining Plaintiffs' need to inform the relevant attorney general of the claims). Regarding *In re Effexor Antitrust Litigation*, those plaintiffs do not appear to have given notice to the attorneys general, and that court dismissed without prejudice and stated that the plaintiffs could amend. *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 390 (D.N.J. 2018). There is little difference between this Court accepting Plaintiffs' corrections now and the *Effexor* court allowing the plaintiffs to get it right later.

Photography—as the "sole proprietor." Doc. 86 ¶¶ 48, 295. Minnesota law likewise recognizes that purchases made in connection with a business may fall within the state's Consumer Fraud Act if the purpose of such is not for resale. *See Ly v. Nystrom*, 615 N.W.2d 302, 310 (Minn. 2000). Here, read favorably, the relevant allegations suggest that the Minnesota Plaintiffs purchased gasoline and diesel fuel as end users and for operations, not for resale. Doc. 86 ¶ 42 (explaining Hayday Farms is a soybean farm that purchased gasoline and diesel fuel in Minnesota at artificially inflated prices due to Defendants' anticompetitive conduct), *id.* ¶ 60 (describing Samantha Barsky purchasing derivate products in Minnesota on behalf of her company, Noteify). Accordingly, the Court denies the request to dismiss Counts 12 and 26.

Missouri and Montana law require a different result. Missouri's Merchandising Practices Act ("Mo.MPA") provides no cause of action when the purchase is made for business purposes. That statute protects purchases "for personal, family, or household purposes . . . ." *See* Mo. Rev. Stat. § 407.025.1(1). Here, Best Expedite alleges to have made the relevant purchases for "business purposes." Doc. 86 ¶ 329. The text and the averment are plain, and Plaintiffs provide no persuasive reasons for which to depart from a straightforward application of the statute. Thus, Best Expedite's claim brought under the Mo.MPA (Count 28) is dismissed. *Cf. HEMCO Corp. v. ADP, Inc.*, Case No. 12-cv-00407, 2012 U.S. Dist. LEXIS 203692, at *9-10 (W.D. Mo. Sep. 25, 2012).

Montana's Unfair Trade Practices & Consumer Protection Act ("Mt.CPA") likewise limits viable claims to consumers who purchase goods or services "primarily for personal, family, or household purposes." Mont. Code. Ann. § 30-14-102(1). Here, Plaintiff Deneige Kapor alleges she purchased gasoline in Montana for personal use. Doc. 86 ¶ 332. So, her claim may proceed. By contrast, Samantha Barsky d/b/a Noteify, Best Expedite Inc., Waypoint Residential LLC, and

Garvin Promotion Group LLC assert that they purchased oil derivative products for business purposes. *Id.* Accordingly, their claims are invalid under the Mt.CPA and will be dismissed.

Finally, the Court declines to dismiss Plaintiffs' Nevada Deceptive Trade Practices Act ("NDTPA") claim. Under Nevada law, "[e]xcept as otherwise expressly provided in a particular statute or required by the context, 'person' means a natural person, any form of business or social organization and any other nongovernmental legal entity, including but not limited to, a corporation, partnership, association, trust or unincorporated organization." Nev. Rev. Stat. Ann. § 0.039. And "[a]n action may be brought by any person who is a victim of consumer fraud" which includes a deceptive trade practice as defined in the NDTPA. Nev. Rev. Stat. Ann. § 41.600(1), (2)(e) (citing §§ 598.0915 to 598.925). Reading these provisions together, the NDTPA does not limit claims to natural persons. Count 33 therefore survives.

### G. Indirect Purchaser Actions and the Consumer Protection Laws of Missouri and South Carolina (Counts 28, 47)

Plaintiffs' indirect-purchaser status does not prohibit them from proceeding with their claims under the Mo.MPA or South Carolina's Unfair Trade Practices Act ("SCUTPA"). Missouri law does not require a direct contractual relationship between the plaintiffs and defendants, and courts have permitted indirect purchasers to proceed under the Mo.MPA. *See, e.g.*, *In re Lithium Ion Batteries*, Case No. 13-md-2420, 2014 U.S. Dist. LEXIS 141358, at *112 (N.D. Cal. Oct. 2, 2014); *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007); *see also Broiler Chicken*, 290 F. Supp. 3d at 821 ("Federal district courts have interpreted *Gibbons* to allow indirect purchaser claims under Missouri's consumer protection statute despite *Illinois Brick*. On this authority, the Court finds that Plaintiffs' Missouri consumer protection act claim is not barred by *Illinois Brick*." (citation modified)). And although South Carolina courts have yet to provide definitive guidance, several cases have allowed such claims to proceed to discovery. *Broiler*

*Chicken*, 290 F. Supp. 3d at 821 (collecting cases). This Court deems that authority persuasive and follows suit. Counts 28 and 47 survive.

### H. End-Payors Who Made Purchases for Business or Commercial Purposes and the Massachusetts Consumer Protection Act (Count 22)

The Massachusetts Consumer Protection Act ("Ma.CPA") makes actionable consumer and business claims. *See* Mass. Gen. Laws. ch. 93A, §§ 9 (consumer), 11 (business). A material difference, however, is that indirect purchasers' antitrust claims are permissible under § 9 but not § 11. *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 630-31 (N.D. Cal. 2020); *Ciardi v. F. Hoffmann La Roche, Ltd.*, 762 N.E.2d 303, 311-12 (Mass. 2002). Plaintiffs Catherine Foster and Michael Clancy allege that they "regularly purchased gasoline for personal use in Massachusetts during the Class period." Doc. 86 ¶ 317. Their claims may thus proceed under § 9 of the Ma.CPA. By contrast, Waypoint alleges that it purchased jet fuel for business reasons. Doc. 86 ¶ 317. Because that claim arises under § 11, Waypoint's Ma.CPA cause of action is dismissed.

### I. Price-Fixing as Consumer Protection Claims in the District of Columbia, Illinois, Maryland, Michigan, New Mexico, Oregon, Rhode Island, South Carolina, and South Dakota (Counts 12, 16, 21, 24, 38, 43, 46, 47, 49)

The Illinois Consumer Fraud and Deceptive Businesses Practices Act ("ICFDBA") bars unfair methods of competition and unfair or deceptive acts and practices. 815 Ill. Comp. Stat. Ann. 505/2. Courts have permitted ICFDBA claims arising from claimed antitrust violations to proceed where that conduct is independently actionable under Illinois antitrust statutes. *See, e.g.*, *Oliver v. Am. Express Co.*, Case No. 19-cv-00566, 2021 U.S. Dist. LEXIS 19578, at *24-25 (E.D.N.Y. Feb. 1, 2021) (collecting cases to explain that a plaintiff may sue for violations for which both the ICFDBA and the Illinois Antitrust Act provide relief). Accordingly, at this stage of the litigation, those claims may proceed.

Plaintiffs' Michigan consumer protection claim (Count 24) also survives. The relevant state statutory provision makes it unlawful to charge "the consumer a price that is grossly in excess of the price at which similar property or services are sold." Mich. Comp. Laws. Ann. § 445.903(1)(z). Courts have construed this language as including conduct that prevents consumers from obtaining a comparable product at a competitive price. *See, e.g.*, *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, Case No. 14-md-02503, 2015 U.S. Dist. LEXIS 125999, at *68 (D. Ma. Aug. 15, 2015) ("Because the end payors allege that there was a gross disparity between the price that Plaintiffs and the End-Payor Class members paid for the brand product and the value received, given that a less expensive substitute generic product should have been available, the alleged conduct fits within the enumerated categories of Michigan law." (citation modified)); *In re Loestrin*, 410 F. Supp. 3d at 378 (D.R.I. 2019) (similar). The Court finds this reasoning sound and concurs with those holdings.

The New Mexico Unfair Practices Act ("NMUPA") is similar, expressly prohibiting unconscionable trade practices that "result[] in a gross disparity between the value received . . . and the price paid." N.M. Stat. Ann. § 57-12-2(E)(2). Plaintiffs' contentions align with that language. They claim that "[b]ecause crude oil is the main raw material used to refine gasoline sold in the United States, Defendants' conspiracy had a direct effect on Plaintiffs and members of the Classes who were forced to purchase gasoline at artificially inflated levels." Doc. 86 ¶ 234. Those allegations state a claim for unconscionable trade practices under the NMUPA. *See In re Aftermarket Filters Antitrust Litig.*, Case No. 08-cv-4883, MDL Docket No. 1857, 2009 U.S. Dist. LEXIS 104114, at *36-37 (N.D. Ill. Nov. 5, 2009) (explaining NMUPA prohibits unconscionable trade practices, including all sales that "result in a gross disparity between the value received and

the price paid[,]" and finding sufficient for gross disparity purposes the plaintiffs' allegations "that they paid 'supra-competitive' prices for the filters they received").

Defendants correctly argue that Plaintiffs' Oregon consumer-protection claim, which is predicated entirely on their price-fixing allegations, is not cognizable under that state's consumer-protection statute. Doc. 129 at 58; *see In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1030 (N.D. Cal. 2007) (observing that "Oregon's Unfair Trade Practices Act lists a number of practices proscribed by the statute[,]" and "price fixing is not among them"). Although Section 646.608(1)(u) of the Oregon Revised Statutes prohibits unfair or deceptive conduct in the course of commerce, suits under that provision may proceed only if the Oregon Attorney General "has first established a rule . . . declaring the conduct to be unfair or deceptive in trade or commerce." § 646.608(4). Plaintiffs have not identified any directive meeting that legal prerequisite. Count 43 is therefore dismissed.

Defendants contend that Plaintiffs have failed to state a claim under Rhode Island's Unfair Trade Practices and Consumer Protection Act ("UTPCPA"). Doc. 129 at 58. The Court is not persuaded. Controlling Rhode Island law provides that courts should consider whether a practice "offends public policy[,]" is "immoral, unethical, oppressive, . . . unscrupulous[,]" or otherwise "causes substantial injury to consumers (or competitors or other businessmen)." *Ames v. Oceanside Welding & Towing Co.*, 767 A.2d 677, 681 (R.I. 2001) (citation modified). Plaintiffs sufficiently allege that Defendants acted unscrupulously, offended public policy through their alleged anticompetitive conduct, and caused Rhode Island consumers to pay supracompetitive prices. Doc. 86 ¶¶ 365-68. Count 46 survives.

The SCUTPA similarly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § 39-5-20(a). That has

been construed to encompass antitrust claims where, as here, Plaintiffs sufficiently allege that Defendants restrained production to artificially inflate prices. *See, e.g.*, *In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758, 883 (D. Minn. 2025). That suffices at this stage of the proceedings, and the Court thus declines to dismiss Count 47.

A similar line of reasoning applies to Plaintiffs' South Dakota state law claims. The South Dakota Deceptive Trade Practices Act ("SDDTPA") generally makes it unlawful for any person to knowingly employ deception, fraud, misrepresentation, or concealment in connection with the sale of merchandise. S.D. Codified Laws § 37-24-6(1). The CCAC contains allegations consistent with these legal prohibitions, which the Court deems sufficient to survive dismissal.[34]

[34] *See* Doc. 86 ¶ 143 (alleging Defendant Chesapeake's CEO Doug Lawler made a misleading statement in a February 2021 interview regarding discipline and responsibility in shale oil production); *id.* ¶ 152 (asserting that in March 2022, during the CERAWeek Conference in Houston, Texas, Chesapeake's "CEO Domenic ('Nick') Dell'Osso confirmed that '[w]ere shale to ramp up output only to have prices fall, we have destroyed a lot of value for shareholders and haven't helped the problem'" (alteration in original) (footnote omitted)); *id.* ¶ 143 (detailing Sheffield's misleading February 2021 statement regarding U.S. shale producers (i.e., Defendants) jointly practicing discipline); *id.* ¶ 143 (showing Defendant Pioneer's then-CEO Sheffield telling investors in a January 2021 webcast that he "never anticipates growing above 5 percent under any conditions, even if oil went to $100 a barrel and the world was short of supply" (citation modified)); *id.* ¶ 143 (quoting CEO Sheffield's declaration that "he was 'totally against' any production increase as 'producers now know the stakes and will stick to their mantra of capital discipline'" (footnote omitted)); *id.* ¶ 143 ("In a June 2021 interview with Reuters, Sheffield said that he was 'confident the producers will not respond' to the high crude oil prices by increasing production, because they were focused on 'shareholder returns.'" (footnote omitted)); *id.* ¶ 149 ("In January 2023, Sheffield confirmed that the 'aggressive growth era of US shale is over' and that Pioneer and the other Defendants were 'no longer a swing producer.'" (footnote omitted)); *id.* ¶ 143 (referencing Defendant Occidental's CEO Vicki Hollub March 2021 statement that "U.S. oil production would not return to pre-pandemic heights, because Defendants and other large U.S. Shale Producers were 'committed to value growth, rather than production growth'" (footnote omitted)); *id.* ¶ 149 ("In March 2022, Occidental Petroleum's CEO Vicki Hollub stated that Occidental had a 'huge inventory of high-quality investments' available around the world, especially in U.S. shale, but was not acting on those opportunities to expand production, instead focusing on maintaining high profits." (footnote omitted)); *id.* ¶ 143 (alleging Defendant EOG's President and CEO Bill Thomas on an August 5, 2021, earnings call "referenced a 'new era' of collaboration in the global crude oil market" and predicted "the U.S. will remain disciplined" (footnote omitted)); *id.* ¶ 140 ("On November 28, 2020, [Thomas]" stated "[i]n the future, certainly

The dispute regarding Plaintiffs' claims for violations of the DCCPA is resolved on similar grounds. That statute provides remedies for a broad range of harmful trade practices, and one of its primary purposes is to "assure that a just mechanism exists to remedy all improper trade practices." *Dist. Cablevision Ltd. v. Bassin*, 828 A.2d 714, 722-23 (D.C. 2003) (emphasis deleted) (internal quotation marks omitted) (first quoting *Atwater v. D.C. Dep't of Consumer & Reg. Affs.*,

---

we believe OPEC will be the swing producer – really, totally in control of oil prices, we don't want to put OPEC in a situation where they feel threatened, like we're taking market share while they're propping up oil prices'" (citation modified)); *id.* ¶ 149 ("On an August 2022 earnings call, Defendant EOG said it planned to keep production growth to 'low single digits' in 2023 and was 'committed to remaining disciplined' despite ideal economic conditions for production increases." (footnote omitted)); *id.* ¶ 149 ("Defendant Diamondback's executive Stice explained on February 22, 2022 that Diamondback would keep its oil production flat in 2024 while increasing dividends and share buyouts, noting 'we have no reason to put growth before returns . . . we will continue to be disciplined.'" (footnote omitted)); *id.* ¶ 134 (explaining that after "a Monday night dinner attended by CEOs John Hess, Vicki Hollub, Mark Papa, and Travis Stice," "CEO Stice spoke with reporters[,] . . . call[ing] [it] 'a very good session' between OPEC and Defendants, noting that the meeting featured 'open dialogue on some of the things that are going on in the U.S. shale revolution, U.S. oil production and the associated balance of what's going on in our industry'" (footnote omitted)); *id.* ¶ 149 ("During a [February 2022] earnings call, Defendant Continental's CEO Berry confirmed, 'we project generating flat to 5% annual production growth rate over the next five years." (citation modified)); *id.* ¶ 114 ("Following a dinner with OPEC officials [in 2017], [John B.] Hess reported to Bloomberg, 'It was a very good exchange of information and views about oil. I really commend the OPEC Secretary General for outreach. It was a good talk.'" (citation modified)); *id.* ¶¶ 129-31 (alleging that in January 2019 at the Davos Economic Forum in Switzerland, John Hess "praised" OPEC's Secretary General's comments regarding the importance of "continuing joint and collaborative efforts among producers" by stating "the Secretary General of OPEC, as well as OPEC members, play a very important role in stabilizing markets for oil, so those efforts are to be recognized" (internal quotation marks omitted) (footnote omitted)); *id.* ¶ 130 (asserting that at that same conference in 2019, Hess "said that the growth of U.S. shale oil output would slow in the near future" (citation modified)); *id.* ¶ 120 ("On March 5, 2018, OPEC officials met with Defendants' executives at Houston's The Grove restaurant, during which Secretary General Barkindo gave a speech to dinner attendees. . . . Defendant Centennial's CEO, Mark Papa described the speech as 'a statement that everyone will work together to make sure the oil market is well-supplied and everyone is happy to be working together.'" (footnote omitted)); *id.* at ¶ 143 ("Defendants also responded to rising prices during this period by withholding production, suddenly (and in near-unison) preaching supply 'discipline' for the first time in the history of U.S. shale."); *id.* ¶ 162 ("The terms Defendants used may have varied: being 'disciplined,' or focusing on 'value growth,' or 'staying in line,' or operating for 'shareholder returns.' But they are all code words for each Defendant's agreement to coordinate and restrain domestic shale oil production.").

566 A.2d 462, 465 (D.C. 1989); and then quoting D.C. Code § 28-3901(b)(1)). To that end, "[t]rade practices that violate other laws, including the common law, also fall within" its purview. *Dist. Cablevision Ltd.*, 828 A.2d at 723 (citing *Atwater*, 566 A.2d at 465-66). Because Plaintiffs plausibly allege that Defendants conspired to restrain production and thereby inflate prices, they state a cognizable claim under the DCPPA. Count 12 survives dismissal.

Finally, because Plaintiffs "concede" that their Maryland consumer protection claim is not cognizable, the Court dismisses it (Count 21). Doc. 156 at 62.

### J. In-State Conduct and Plaintiffs' Illinois and New Hampshire Consumer Protection Claims (Counts 16, 35)

The ICFDBA applies only when the circumstances "relat[ing] to the disputed transaction occur[ed] primarily and substantially in Illinois." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 853-54 (Ill. 2005). The Illinois Plaintiffs allege that they purchased gasoline or diesel for business or personal use in Illinois and that the prices they paid were inflated as a result of the Defendants' anticompetitive conduct. Doc. 86 ¶¶ 19, 23, 36, 39. Taken as true, those allegations are sufficient to state a claim for relief. The Court thus declines to dismiss Count 16.

The New Hampshire Consumer Protection Act prohibits unfair or deceptive conduct in trade or commerce, defining trade and commerce to include conduct "directly or indirectly affecting the people of th[e] state." N.H. Rev. Stat. Ann. §§ 358-A:2, 358-A:1(II). Plaintiffs allege that New Hampshire purchasers bought crude oil derivative products in the state and incurred overcharges there as a result of Defendants' nationwide price-fixing conspiracy. Doc. 86 ¶¶ 341-44. Those allegations satisfy the required connection to New Hampshire. *See In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 760-61 (E.D. Pa. 2014). Dismissal of Count 35 is unwarranted.

### K. Rule 9(b)'s Heightened Pleading Standard and Plaintiffs' Claims Brought Under Florida's and Michigan's Laws (Counts 13, 24)

Defendants argue that Plaintiffs' claims under Florida's and Michigan's "consumer protection laws fail because plaintiffs have not pleaded these claims with the particularity required by Federal Rule of Civil Procedure 9(b)." Doc. 129 at 60. But that Rule's heightened pleading standard applies exclusively to claims sounding in fraud and does not generally apply to those at issue here. For example, Florida's Deceptive and Unfair Trade Practices Act prohibits "'unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.' Anticompetitive conduct alone may give rise to a claim under this statute; allegations of fraud are not required." *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours and Co.*, Case No. 12-cv-01180, 2015 U.S. Dist. LEXIS 106292, at *24 (N.D. Cal. Aug. 11, 2015) (citing Fla. Stat. § 501.204(1)) (citation modified); *see also In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 899-901 (E.D. Pa. 2012). The Michigan Plaintiffs similarly allege that they paid excessive prices for crude oil derivative products. *See supra* Section IV.I. Rule 9(b) does not mandate dismissal of Counts 13 or 24.

### L. Reliance and the Consumer Protection Statutes of Arkansas and Pennsylvania (Counts 2, 44)

Plaintiffs do not assert that they relied on misleading or deceptive conduct in the course of purchasing crude oil derivative products. Arkansas's Deceptive Trade Practices Act ("ADTPA") expressly requires a plaintiff to allege that they "reli[ed] on the use of a practice declared unlawful under . . . chapter [88]." Ark. Code Ann. § 4-88-113(f)(2); *see Mbadiwe v. Amazon.com, Inc.*, Case

No. 22-cv-9542, 2025 U.S. Dist. LEXIS 183705, at *58-59 (S.D.N.Y. Sept. 18, 2025). Plaintiffs do not plead reliance, and their Arkansas state law claims (Count 2) must be dismissed.[35]

Pennsylvania law requires the same result for a similar reason. The Pennsylvania Supreme Court has ruled that "[r]egardless of which unfair method of competition a plaintiff challenges in a private cause of action, . . . Section 201-9.2 [of Pennsylvania's Unfair Trade Practices and Consumer Protection Law] requires the plaintiff to establish justifiable reliance." *Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637, 646 (Pa. 2021). Plaintiffs do not allege that they relied on Defendants' claimed anticompetitive conduct when making purchases, so Count 44 is dismissed.

### M. Elderly or Disabled Persons Under Nevada Law (Count 33)

Nevada law permits "any person who is a victim of consumer fraud" to file suit and defines such fraud to include "a deceptive trade practice as defined in NRS 598.0915 to 598.0925 . . . ." Nev. Rev. Stat. § 41.600(1), (2)(e). Section 598.0977 provides additional remedies to elderly or disabled persons. It does not cabin any other causes of action. *See In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 226-27 (S.D.N.Y. 2012). The Court thus agrees that "any victim of consumer fraud may bring a civil action, [but] elderly and disabled persons may recover more for each violation." *Id.* at 227. Count 33 survives.

## V. Defendants' Individual Motions to Dismiss

Continental, Diamondback, EOG, Permian, Occidental, Expand, Hess Defendants, and Pioneer filed individual motions to dismiss. Docs. 123-27, 130-32. Permian also requests that the Court judicially notice publicly available SEC material in support of its motion. Doc. 128. Those Defendants raise four general arguments in their individual motions: a lack of parallel conduct,

---

[35] The Court is aware of the holding in *In re Pork Antitrust Litigation*, 495 F. Supp. 3d 753, 781 (D. Minn. 2020), which discounted the reliance element under the ADTPA. This Court respectfully disagrees with that holding and reaches a different conclusion for the reasons given above.

insufficient plus factors, that the Court should look outside the CCAC at the 12(b)(6) stage, and an absence of personal jurisdiction. Because the arguments substantially overlap, the Court addresses the collective issues together rather than one by one. The Court then considers additional arguments raised by Expand and the Hess Defendants. For the reasons explained below, the Court grants Expand's individual motion in part by dismissing Count 1 against it, denies all other individual motions to dismiss in their entirety (save for holding in abeyance the 12(b)(2) parts of the Hess Defendants' and Pioneer's individual motions), and denies Permian's request for judicial notice. Doc. 131 (Expand's motion); Docs. 123-27, 132 (remaining individual motions to dismiss); Doc. 128 (Permian's motion for judicial notice).

### A. Parallel Conduct: Continental, Diamondback, EOG, Permian, Occidental, Expand

Continental, Diamondback, EOG, Permian, Occidental, and Expand argue that Plaintiffs have failed to allege parallel conduct.[36] These Defendants assert that they increased production in absolute terms, did not meaningfully decrease their production growth rates, and that their production rates varied significantly thereby undermining Plaintiffs' claims of a conspiracy. These arguments repeat those made jointly by the parties, and the Court again rejects them. In short, Plaintiffs adequately allege a decrease in relative production, and differences in production rates do not now defeat Plaintiffs' assertions of unlawful parallel conduct. *See supra* Section II.A. The individual motions provide no distinct or independent basis to dismiss Plaintiffs' claim, and at the pleading stage, those allegations are sufficient.

---

[36] Hess also argues that Plaintiffs do not establish parallel conduct. Doc. 132. The Court addresses that contention separately. *Infra* Section V.E.2.

### B. Lack of Plus Factors: Continental, Diamondback, EOG, Permian, Occidental, Expand, Hess Defendants

Continental, Diamondback, EOG, Permian, Occidental, Expand, and the Hess Defendants argue that Plaintiffs fail to allege specific plus factors against them on an individual basis. Again, the Court has already determined that Plaintiffs adequately allege enough plus factors to make it plausible that Defendants' reduced production growth rates (their parallel conduct) were products of a conspiracy. *See supra* Section II.B. Accordingly, Plaintiffs need allege only that Continental, Diamondback, EOG, Permian, Occidental, Expand, and the Hess Defendants "ha[d] some role in the conspiracy." *Othart Dairy Farms, LLC v. Dairy Farmers of Am., Inc.*, 720 F. Supp. 3d 1087, 1109 (D.N.M. 2024).

Plaintiffs have met that burden. They identify company-specific meetings, communications with competitors that endorse limited growth, and other conduct relevant to the conspiracy. For example, the CCAC reads that Continental (inter alia) spoke publicly about the "need to settle on a plan to stabilize oil prices sooner than later[,] [and] call[ed] for a freeze of production"; met with John B. Hess and OPEC Secretary General Barkindo during the 2018 CERAWeek Conference; made a statement on an earnings call projecting little "annual production growth for the next five years"; attended a meeting with John B. Hess, EOG Resources, and other top tier producers; and is one of ten companies that owns 15 or more oil rigs in the United States. Doc. 86 ¶¶ 111, 118, 149, 195, 167 (citation modified). Regarding Diamondback, Plaintiffs contend that CEO Travis Stice (1) attended a dinner in March 2019 with OPEC General Secretary Mohammed Barkindo and other Defendants at which they discussed the industry and was what Stice described as "a very good session between OPEC and Defendants"; (2) preached in February 2022 discipline regarding production (during the Class Period); and (3) shared a private dinner in 2023 with OPEC Secretary-General Haitham Al Ghais and other Defendants, one that occurred

just on the heels of Sheffield's predictive comments regarding which countries would be in charge of oil production (also during the Class Period). *Id.* ¶¶ 134, 149, 150. Moreover, the CCAC contains allegations that Diamondback is one of ten companies that owns fifteen rigs or more in the U.S. oil market (at a relevant time); that a former Diamondback Senior Lease Operator stated that Diamondback "often collaborated with other Shale Oil producers, like Pioneer, to share water supplies"; and that Diamondback is owned by investors that also own substantial portions of other Defendants (horizontal shareholding). *Id.* ¶¶ 167, 195, 197-203. Plaintiffs also make substantial allegations regarding EOG that plausibly tie it to the broader conspiracy. *See, e.g.*, *id.* ¶ 140 (alleging EOG CEO "confirmed [in late 2020] Defendants' willingness, as a group, to follow OPEC's lead on pricing . . ."); *id.* ¶ 143 (showing EOG preached collaboration and discipline in August 2021); *id.* ¶ 149 (describing reports detailing EOG planning to restrain oil growth during the Class Period despite skyrocketing prices). Similarly, Plaintiffs sufficiently link Permian to the conspiracy. *See, e.g.*, *id.* ¶ 120 (March 2018 private dinner with OPEC Secretary General and other Defendants described in part as centering around collaborative supply plans); *id.* ¶¶ 132-34 (March 2019 CERAWeek dinner with OPEC personnel and some Defendants); *id.* ¶ 195 (Centennial fracking consultant explaining the prevalent collaboration between Defendants and gentleman's agreements). With respect to Occidental, the CCAC contains plenty of allegations to meet the legal standard.[37] The same goes for Expand. *See, e.g.*, *id.* ¶ 113 (explaining first meeting in March 2017

---

[37] *See* Doc. 86 ¶¶ 129-31 (describing Hollub attending in early 2019—i.e., the time at which Defendants could establish the conspiratorial groundwork—an international conference with OPEC personnel and other Defendants); *id.* ¶ 134 (showing Hollub participating in a March 2019 CERAWeek conference dinner with OPEC and various Defendants to discuss U.S. oil production); *id.* ¶ 143 (explaining Defendants making statements regarding supply and demand and putting value growth over production growth); *id.* ¶ 149 (preaching in March 2022 a focus on profits over production); *id.* ¶ 150 (attending 2023 private dinner with OPEC and other Defendants); *id.* ¶ 167 (being one of ten U.S. oil companies owning fifteen or more rigs (market concentration)); *id.* ¶ 192 (explaining concentrated market ownership enabling conspiracy); *id.* ¶ 197 (showing

between OPEC and U.S. Shale Producers); *id.* ¶ 143 (preaching in February 2021 responsibility and discipline); *id.* ¶¶ 150, 152 (2022 and 2023 private meetings with OPEC and other Defendants); *id.* ¶ 197 (showing horizontal shareholding). Finally, Hess Defendants are tied to the conspiracy.[38]

Ultimately, Plaintiffs successfully plead a broader conspiracy among Defendants. *See supra* Section II.B. And although Defendants' alleged conduct differs, it need not be identical. Here, and when read in the context of the whole CCAC, Plaintiffs connect Continental, Diamondback, EOG, Permian, Occidental, Expand, and the Hess Defendants to the conspiracy. Defendants' arguments to the contrary fail. *See Othart Dairy Farms*, 720 F. Supp. 3d at 1109 ("Not all defendants need to participate in all aspects of the allegations so long as each defendant has some role in the conspiracy."); *JBS USA Food Co.*, 2023 U.S. Dist. LEXIS 173160, at *40-41 (finding sufficient allegations that defendant Agri Beef was linked to Red Meat Industry Compensation Meetings, where conspiratorial agreements were said to have occurred); *Broiler Chicken.*, 290 F. Supp. 3d at 803-04 (concluding it was enough to allege that (1) defendants made production cuts or attempted to constrain, (2) each defendant subscribed to Agri Stats, and (3) executives of defendants "participated in industry conferences and trade association meetings").

---

horizontal shareholding, which can lessen competitive incentives even if companies have some non-common owners).

[38] *Id.* at ¶ 113 (March 2017 CERAWeek Conference meeting with OPEC and U.S. Shale Producers, a first of its kind); *id.* ¶ 114 (John Hess describing dinner with OPEC officials as a "very good exchange" of oil information); *id.* ¶ 126 (attending international seminar with OPEC officials and Sheffield); *id.* ¶ 129 (sitting on a panel with other Defendants); *id.* ¶ 134 (2019 dinner with OPEC personnel and various Defendants); *id.* ¶ 152 (2022 and 2023 private meetings with OPEC and Defendants); *id.* ¶¶ 183-88 (explaining FTC consent decree inter alia forbidding "John Hess[] from joining Chevron's Board of Directors based on FTC's evidence of Hess's years-long efforts to fix the price of crude oil"); *id.* ¶ 195 (showing former Hess engineer and senior construction worker describe frequent collaboration between Hess and top producers); *id.* ¶¶ 197-203 (horizontal shareholding).

### C. Looking Outside the Complaint: Continental, Diamondback, EOG, Occidental, Permian, Expand, Hess Defendants

Continental, Diamondback, EOG, Occidental, Permian, Expand, and the Hess Defendants request that the Court consider articles, earnings call materials, and SEC filings, some of which Plaintiffs refer to in the CCAC. Those individual defendants rely on the materials to challenge Plaintiffs' key factual contentions supporting the conspiracy claims, to provide lawful explanations for production decisions, and to show that Plaintiffs have mischaracterized certain statements.[39]

[39] *See, e.g.*, Doc. 123 at 15 (asking the Court to consider the larger context of Continental's Q4 2021 earnings call: "Indeed, Mr. Berry's complete earnings call statement (incorporated in Plaintiffs' Complaint) show why such statements do not plausibly support conspiracies"); *id.* at 15-16 (stating the Court can take judicial notice of Continental's February 2016 Form 8-K to consider Continental's assertion that, because "Continental had already publicly disclosed its future production plans in the years predating the alleged conspiracy[,]" it was merely continuing its historic practices); *id.* at 17 (arguing the Court should consider the entire article Plaintiffs cite as opposed to accepting Plaintiffs' characterization of it); Doc. 124 at 8-10 (explaining that if the Court were to look at the "sources Plaintiffs cite in their Complaint" and not allow Plaintiffs to "misleadingly cherry-pick very small snippets of [Diamondback's Chairman and CEO Travis Stice's] comments" during a February 2022 earnings call, it would be apparent that the statements quoted do not support a conspiracy allegation); *id.* at 11 ("In fact, according to the article Plaintiffs cite, two officials from the US Department of Energy were also present at the March 2023 dinner." (citation modified)); Doc. 125 at 5 (asserting that, when considered as a whole, "the cited 2022 earnings call transcript shows that EOG's stated commitment to 'discipline' was in fact a commitment to EOG's 'disciplined reinvestment strategy'" (citation omitted)); *id.* at 6 n.3 ("Plaintiffs also try to contort the first of these statements by characterizing it as reflecting 'Defendants' willingness, as a group, to follow OPEC's lead on pricing,' but it is clear that Mr. Thomas was speaking only on behalf of EOG as its CEO."); *id.* at 8 (contending that an article Plaintiffs cite actually supports Defendants' position); Doc. 126 at 2 & n.2 (asking the Court to take judicial notice of Occidental's 4Q2018 Earning Conference Call Presentation and arguing that doing so would show that Occidental "never departed from its historical oil production strategy"); *id.* at 3 n.3 (telling the Court that it may independently review an article and interview the Complaint references); *id.* at 3 & n.4 (citing Occidental's 2Q2019 Earnings Conference Call Presentation and its 2019 Form 10-K to argue that its statements and moderate production growth should not be considered conspiratorial); Doc. 127 at 9-10 ("[T]he Court is entitled to consider PR's complete public figures under Rule 12(b)(6) because Plaintiffs refer to and selectively rely upon those figures as the support for the central allegation that PR joined the other Defendants in reducing oil production."); *id.* at 11 ("PR's 2023 Form 10-K states that PR's U.S. net production of oil increased from 11,701 MBbls in 2021, to 18,235 MBbls in 2022, to 35,560 MBbls in 2023."); *id.* at 15 ("Plaintiffs' incomplete figures are cherry-picked to obscure an even more dramatic record of increased production obvious from PR's public SEC filings."); Doc. 128 at 2 (requesting Court take judicial notice of PR's 2023 Securities and Exchange Commission Form 10-K); Doc. 133 at

The Court declines to resolve the parties' competing factual narratives at this stage. Ordinarily, "the sufficiency of a complaint must rest on its contents alone." *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). Although the Court may look to "documents the complaint incorporates by reference, documents referred to in the complaint if they are central to the plaintiff's claim and the parties do not dispute their authenticity, and matters of which a court may take judicial notice," their import is limited at the motion to dismiss stage. *Smallen v. W. Union Co.*, 950 F.3d 1297, 1305 (10th Cir. 2020) (citation modified). Materials subject to judicial notice may "be considered to show their contents, not to prove the truth of matters asserted therein." *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) (internal quotation marks omitted) (quoting *Oxford Asset Mgmt. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002)). Accordingly, the Court will not now resolve competing factual inferences, e.g., that Defendants' production decisions resulted from independent business considerations rather than coordination. These disputes may be resolved after discovery and following development of the evidentiary record, but it is inappropriate to undertake that assessment as part of a motion to dismiss. Defendants' motions are denied.

### D. Defendants Hess's, John B. Hess's, and Pioneer's Individual Motions to Dismiss for Lack of Personal Jurisdiction[40]

A court presiding over a case transferred pursuant to the multidistrict litigation statute need

---

6 ("Expand reduced its oil production because it was exiting the oil business—a fact that was widely known and repeatedly acknowledged in public SEC filings and news articles that the Court can take judicial notice of." (emphasis deleted)); *id.* at 15 (arguing Expand's Q4 2021 Results Earnings Call Transcript is incorporated by reference in the CCAC); Doc. 132 at 7 ("In short, Hess's judicially noticeable crude oil production increases doom Plaintiffs' parallel-conduct claim."); *id.* at 13 ("[S]crutiny of the sources cited in the Complaint reveals that Plaintiffs repeatedly mischaracterized these second-hand accounts, yielding allegations that warrant no credit from the Court.").

[40] Hess, John B. Hess, and Pioneer have joined Defendants' Rule 12(b)(6) motion as well as separately moved to dismiss for lack of personal jurisdiction. The Court resolves the Rule 12(b)(6) motion here but holds their separate jurisdictional motions in abeyance pending the completion of limited jurisdictional discovery.

not independently possess personal jurisdiction over a defendant. Rather, "the transferee court can exercise personal jurisdiction to the same extent that the transferor court could." *In re Delta Dental Antitrust Litig.*, 509 F. Supp. 3d 1377, 1379 (J.P.M.L. 2020) (internal quotation marks omitted) (quoting *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 297 n.11 (3d Cir. 2004)). While jurisdiction may arise in different ways, relevant here is Section 12 of the Clayton Act.

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22. This statutory text addresses two related but distinct matters. The first clause provides a standalone basis for venue against corporations in antitrust actions;[41] the second permits nationwide service of process and personal jurisdiction. *K.M. Enters., Inc. v. Glob. Traffic Techs., Inc.* 725 F.3d 718, 724 (7th Cir. 2013).

Despite its brevity, Section 12 has generated considerable discussion over its meaning. There is a circuit split regarding whether Plaintiffs must satisfy that specific venue provision to avail themselves of the statute's nationwide-service provision.[42] The main dispute is the kind only

---

[41] This is in addition to the general venue statute. *See* 28 U.S.C. § 1391; *Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1413 (9th Cir. 1989).

[42] *Compare K.M. Enters., Inc.*, 725 F.3d at 728-30 ("[W]e join the Second and D.C. Circuits in holding that Section 12's venue and service-of-process provisions must be read together."), *and Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 427 (2d Cir. 2005) ("[W]hen we interpret Section 12 the way it is written, we are obliged to conclude that its service of process provision can properly confer personal jurisdiction over a defendant only when the action is brought in the district where the defendant resides, is found, or transacts business, that is, the district where Section 12 venue lies." (citation modified)), *and GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000) ("A party seeking to take advantage of Section 12's liberalized service provisions must follow the dictates of both its clauses."), *with In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d at 296-97 ("We, therefore, hold that the service of process provision on foreign corporations is independent of, and does not require satisfaction of, the specific venue provision under Section 12 of the Clayton Act."), *and Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1413 (9th Cir. 1989) ("[A]fter our analysis of the relationship of venue

circuit judges enjoy: what is the meaning of Section 12's use of the words "in such cases." *See, e.g.*, *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 422 (2d Cir. 2005) ("The answer turns on construction of the introductory phrase 'in such cases' in the process provision, which defines the scope of its applicability."). Under the approach adopted by the Ninth and Third Circuits, Section 12's nationwide-service provision is available regardless of whether its additional venue requirements are met. *Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1416 (9th Cir. 1989) ("[W]hen a statute authorizes nationwide service of process, national contacts analysis is appropriate."); *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d at 296-97. Those circuits reason that the phrase "in such cases" refers to antitrust actions against corporations generally. *See Go-Video, Inc.*, 885 F.2d at 1412; *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d at 293-99. The more restrictive approach, which is the view adopted by the Second, Seventh, and D.C. Circuits, requires plaintiffs to satisfy Section 12's venue provision before they may avail themselves of the statute's nationwide-service provision. *Daniel*, 428 F.3d at 427; *K.M. Enters., Inc.*, 725 F.3d at 728; *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000). The Second and D.C. Circuits read "in such cases" to refer only to those antitrust actions satisfying Section 12's venue provision. *Daniel*, 428 F.3d at 423-24; *GTE New Media Servs.*, 199 F.3d at 1351. The Seventh finds the text less clear but reaches the same result. *K.M. Enters., Inc.*, 725 F.3d at 730 ("In sum, while we find the language of Section 12 too ambiguous to rely on the 'plain meaning' rationale endorsed by the Second and D.C. Circuits, the practical effects of decoupling the clauses of Section 12 are ultimately too bizarre and contrary to

statutes generally, the purpose and history of the Clayton Act, particularly section 12, the prior caselaw, and the structure of the section itself, we conclude that process may be served on an antitrust defendant pursuant to 15 U.S.C. § 22 in cases where venue is not established under that section but lies properly under 28 U.S.C. § 1391(d).").

Congress's apparent intent for us to endorse. Thus, we hold that Section 12 must be read as a package deal.").

The Court need not resolve that disagreement on the present record. Under either interpretation, Section 12 authorizes nationwide service where the action is brought in a district in which the corporate defendant is an inhabitant, is found, or transacts business. *Compare Daniel*, 428 F.3d at 427, *with Go-Video, Inc.*, 885 F.2d at 1413-4. Thus, if Plaintiffs can establish that Section 12's venue requirement is satisfied in the relevant transferor or first-filed forums (California, Nevada, New Mexico), the disagreement among the circuits becomes immaterial.

The present record is insufficient to make that determination. Whether a corporation "transacts business" within a district turns on the practical realities of its commercial activities there. *See United States v. Scophony Corp. of Am.*, 333 U.S. 795, 810 (1948) ("To say that on the facts presented Scophony transacted no business 'of any substantial character' there during the period covered by institution of the suit and the times of serving process would be to disregard the practical, nontechnical, business standard supplied by 'or transacts business' in the venue provision."). And here, much of the information necessary to make that assessment is solely within Defendants' possession. At this early stage of the litigation, the Court concludes that a more developed factual record is warranted.

District courts possess broad discretion to allow for jurisdictional discovery. Such discovery is particularly appropriate when "pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1326 (10th Cir. 2002) (citation modified) (quoting *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977)); *see also 25 CP, LLC v. Firstenberg Mach. Co.*, Case No. 09-cv-80, 2009 WL 4884483, at *10 n.14 (D.N.H.

Dec. 8, 2009) ("[The court has] authority to order jurisdictional discovery sua sponte."). Accordingly, the Court finds that some limited jurisdictional discovery is both necessary and appropriate.

One distinction is necessary as to Defendant John B. Hess. Section 12, by its terms, applies to an action "against a corporation," and therefore does not itself provide a basis for nationwide service on an individual defendant. 15 U.S.C. § 22. The Court accordingly does not rely on Section 12 as a basis for personal jurisdiction over John B. Hess. The present record is likewise insufficient, however, to resolve the parties' separate arguments concerning personal jurisdiction over him. Limited jurisdictional discovery concerning those issues is therefore warranted as well.

The Court will accordingly hold the relevant 12(b)(2) portions of Hess's, John B. Hess's, and Pioneer's motions in abeyance. As to Pioneer and Hess, the parties may conduct limited jurisdictional discovery concerning whether Section 12's venue requirement is satisfied in the pertinent transferor and first-filed districts and any related matters necessary to determine personal jurisdiction. As to John B. Hess, discovery shall be limited to the separate factual issues bearing on personal jurisdiction over him. The resulting record will permit the Court to determine if it is necessary to answer whether Section 12's venue and process provisions may be read independently, and, ultimately, whether dismissal of Pioneer, Hess, or John B. Hess is warranted. The parties are directed to meet and confer regarding the scope and timing of that discovery, supplemental briefing, and the impact on the existing scheduling order. They must then submit a joint proposed schedule to the Court.

## E. Miscellaneous: Expand and Ongoing Harm, Hess Defendants and Global Prices

### 1. Expand

Expand separately argues that Count 1 should be dismissed because Plaintiffs cannot state a claim for injunctive relief against it. The Court agrees. Although Section 1 of the Sherman Act

permits relief against threatened antitrust injury, there must be more than the possibility that discontinued conduct might someday recur. *See., e.g.*, *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 306 (D.C. Cir. 2023) ("It makes no sense to require Facebook to foreswear a policy that ended in 2018 . . . ."); *United States v. Agri Stats, Inc.*, 2024 U.S. Dist. LEXIS 94142, at *21 (D. Minn. May 28, 2024) ("Plaintiffs must establish 'that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.'" (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953))). The CCAC contains neither allegations indicating that Expand produces shale oil nor facts plausibly suggesting that it is likely to resume the challenged conduct. *See* Doc. 86. Count 1 is therefore dismissed as to Expand.

**2. Hess**

The Hess Defendants argue that Plaintiffs allege a conspiracy to fix global prices of crude oil and therefore cannot establish parallel conduct by focusing on Defendants' domestic production. Doc. 132 at 7. That argument misreads the CCAC. As explained above, Plaintiffs allege a conspiracy to constrain domestic production and artificially inflate the price for crude oil and crude oil derivative products in the United States. *Supra* Section I. The Court again rejects this argument, and that portion of the motion is denied. *Id.*

## CONCLUSION

Granting in part Defendants' Joint MTD, the Court:

1. Dismisses Counts 21 and 43 in their entirety, *supra* Section IV.I.;
2. Dismisses Counts 8 and 36 in part by barring recovery under the relevant statutes for conduct occurring before June 7, 2023 and August 5, 2022, respectively, *supra* Section IV.C.;

3. Dismisses Count 22 in part by disallowing Waypoint Residential LLC's claims under the relevant statute, *supra* Section IV.H.;

4. Dismisses Count 28 in part by prohibiting Best Expedite Inc. from pursuing claims under the relevant statute, *supra* Section IV.F.;

5. Dismisses Count 29 in part by barring plaintiffs who purchased derivative products for business purposes—namely, Samantha Barsky d/b/a Noteify, Best Expedite Inc., Waypoint Residential LLC, and Garvin Promotion Group LLC—from bringing claims under the relevant statute, *supra* Section IV.F.;

6. Dismisses Count 3 entirely, *supra* Section IV.D.; and

7. Dismisses Counts 2 and 44 in their entirety, *supra* Section IV.L.

Concerning the Individual Motions to Dismiss and Permian's Motion for Judicial Notice, the Court orders the following:

1. Continental's, Diamondback's, EOG's, Permian's, and Occidental's motions to dismiss are denied. Docs. 123-27; *supra* Section V.

2. Expand's individual motion to dismiss is granted in part, as Count 1 is dismissed against it. Otherwise, Expand's motion is denied. Doc. 131; *supra* Section V.

3. Hess Defendants' 12(b)(6) portions of their motion are denied, and their 12(b)(2) argument is held in abeyance pending limited jurisdictional discovery. Doc. 132; *supra* Section V.

4. Pioneer's 12(b)(2) motion is also held in abeyance while the relevant parties conduct limited jurisdictional discovery. Doc. 130; *supra* Section V.

5. The parties must provide their proposal for resolving Pioneer's, Hess's, and John B. Hess's 12(b)(2) motions no later than 5:00 PM (MDT) on September 16, 2026.

6. Permian's motion for judicial notice is denied. Doc. 128; *supra* Section V.

It is so ordered.

UNITED STATES DISTRICT JUDGE
MATTHEW L. GARCIA